UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROBERTO ROMERO, M.D.,

        Plaintiff,

v.

IRINA BUHIMSCHI, M.D., et al.,

        Defendants.

_____/

CIVIL ACTION NO. 06-10859

DISTRICT JUDGE PAUL V. GADOLA

MAGISTRATE JUDGE DONALD A. SCHEER

## REPORT AND RECOMMENDATION

### I.    RECOMMENDATION:

I recommend that Defendant Buhimschi's Motion to Dismiss be granted as to Count I, denied as to Count II and granted in part as to Count V.

I recommend that Defendant Yale University's Motion to Dismiss be granted as to Count I and granted in part as to Count V.

I recommend that Defendant Weiner's Motion to Dismiss be granted as to Counts I, IV and VI.

I recommend that Defendant Royal College of Obstetrics and Gynecology's Motion to Dismiss be granted as to Counts I, III and VII.

### II.    REPORT:

#### A.    Procedural History

This action was originally filed on February 27, 2006. On April 13, 2006, Defendant Yale University filed a Motion to Dismiss. That motion was stricken, and an Amended Motion to Dismiss by Yale University was filed on April 26, 2006. Plaintiff filed a Brief in Opposition to Yale's motion on May 1, 2006. Defendant Buhimschi filed a separate Motion to Dismiss on April 26, 2006, in which she adopted Yale's arguments with regard to Counts

I (Lanham Act claim) and V (defamation).  Plaintiff responded to that motion on May 3, 2006.  Yale and Buhimschi filed reply briefs on May 10, 2006 and May 12, 2006, respectively.  Defendant Weiner filed his Motion to Dismiss on May 15, 2006, also adopting Yale's position as to Count I.  Plaintiff responded to that motion on June 1, 2006.

On May 16, 2006, Plaintiff filed a Motion to Amend/Correct Complaint, which motion was granted by Magistrate Judge Majzoub on June 16, 2006.  Plaintiff's First Amended Complaint, adding Count VII against Defendant Royal College of Obstetricians and Gynaecologists,  was filed on June 20, 2006.

On July 27, 2006, Defendant Royal College of Obstetricians and Gynaecologists filed a Motion to Dismiss, joining in Yale's Rule 12(b)(6) challenge to Count I.  Plaintiff responded in a brief filed on August 31, 2006, and a reply brief was filed on September 1, 2006.

On November 17, 2006, the district judge referred the dispositive motions to Magistrate Judge Majzoub for Report and Recommendation.  On November 27, 2006, the case was reassigned to the undersigned magistrate judge.

**B.      Applicable Law and Standard of Review**

Federal Rule of Civil Procedure 12(b)(6) provides that a Complaint must be dismissed if it fails to state a claim upon which relief may be granted.  In assessing a Motion to Dismiss, the Court "must construe the Complaint in the light most favorable to the plaintiff, accept all factual allegations as true, and determine whether the plaintiff undoubtedly can prove no set of facts in support of his claims that would entitle him to relief."  Allard v. Weitzman, (In Re: DeLorean Motor Company), 991 F.2d 1236, 1239-40 (6th Cir. 1993) (citing Meador v. Cabinet for Human Resources, 902 F.2d 474, 475 (6th Cir.),

cert. denied, 498 U.S. 867 (1990)); see also, Conely v. Gibson, 355 U.S. 41 (1957). "A Complaint need not set down in detail all the particulars of a plaintiff's claim, but must simply give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." Lillard v. Shelby County Board of Education, 76 F.3d 716, 726 (6th Cir. 1996) (citation omitted).

Although the standard is liberal, it requires more than the bare assertion of legal conclusions. In Re: DeLorean Motor Company, 991 F.2d at 1240; Scheid v. Fanny Farmer Candy Shops, Inc., 859 F.2d 434, 436 (6th Cir. 1998). The Complaint must "contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." Scheid, 859 F.2d at 436 (quoting Car Carriers, Inc. v. Ford Motor Company, 745 F.2d 1101, 1106 (7th Cir. 1984), cert. denied, 470 U.S. 1054 (1985)).

Rule 56(c) of the Federal Rules of Civil Procedure provides that a motion for summary judgment will be granted when the moving party establishes that there is no genuine issue of material fact for trial and that he is entitled to judgment as a matter of law. Celotex v. Catrett, 477 U.S. 317, 323 (1986). The Court must consider all pleadings, affidavits, and admissions on file and draw all justifiable inferences in favor of the party opposing the motion. Smith v. Hudson, 600 F.2d 60, 64 (6th Cir.), cert. dismissed, 444 U.S. 986 (1989). The moving party has the burden of showing the Court that no genuine issues of material fact remain. Agristor Financial Corp. v. Van Sickel, 967 F.2d 233, 236 (6th Cir. 1992). However, Rule 56(e) states that the non-moving party has the burden of setting forth "specific facts showing that there is a genuine issue for trial," or else a judgment for the moving party will be entered.

## C.    Factual History

Plaintiff, Roberto Romero, M.D., is a physician specializing in maternal-fetal medicine.  At all times relevant to this case, he was Chief of the Perinatology Research Branch ("PRB") of the National Institute of Child Health and Human Development ("NICHD"), a tenured member of the National Institutes of Health ("NIH"), and a citizen of the State of Michigan.  The PRB is one branch of the NICHD's intramural division, and is housed at the Detroit Medical Center ("DMC"), a clinical campus of Wayne State University ("WSU") in Detroit, Michigan.

Defendant, Irina Buhimschi, M.D. ("Buhimschi"), is a faculty member and full-time employee of Defendant Yale University ("Yale"), and is a citizen of the State of Connecticut. She is employed at the Department of Obstetrics and Gynecology and Reproductive Sciences at Yale University School of Medicine in New Haven, Connecticut.  Prior to moving to Yale, in July 2003, Buhimschi was an assistant professor at WSU from July 1, 2001 to June 26, 2003.

Defendant, Yale University, is governed by Yale Corporation, established and maintained under the laws of the State of Connecticut.

Defendant Carl Weiner is a citizen of the State of Kansas, and is employed by the Department of Obstetrics and Gynecology, University of Kansas School of Medicine, in Kansas City, Kansas.

Defendant Royal College of Obstetricians and Gynaecologists is a British Corporation operating in London, England.  It publishes a journal entitled *The British Journal of Obstetrics and Gynaecology: An International Journal.*

4

The First Amended Complaint alleges that Plaintiff and Buhimschi collaborated on certain research in the subject of "Proteomics," which refers to the identification of proteins contained in biological materials in the aggregate, rather individually. Plaintiff alleges that the collaborative research was conducted at WSU by himself, Buhimschi and other members of the PRB. The collaborative research was conducted pursuant to protocols approved by the Institutional Review Board ("IRB") of WSU and/or NICHD. The research conducted by Plaintiff and Buhimschi (and others) resulted in a manuscript that was submitted to the British Medical Journal, *The Lancet*, for publication in November 2002. An abstract of the Proteomics data was also submitted and accepted for oral presentation at a plenary session of the annual meeting of the Society for Maternal-Fetal Medicine ("SMFM"). As required by *The Lancet*, Buhimschi submitted a description of the contribution made to the research by each of her collaborators to justify authorship. Buhimschi described Plaintiff's contribution as "participated in the design of the study, supervised the clinical assessments and assisted with the interpretation of data and preparation of the paper." Plaintiff, Buhimschi and others were listed as authors on the published abstract. In February 2003, Buhimschi allegedly received a favorable response from *The Lancet*, but several manuscript revisions were requested. Buhimschi revised the manuscript, deleting certain data and omitting Plaintiff and other researchers as authors. *The Lancet*, however, would not publish the article until the authorship dispute was resolved, and Buhimschi withdrew the manuscript.

Plaintiff filed allegations of scientific misconduct against Buhimschi with WSU. Attempts by WSU to resolve the conflict informally were unsuccessful. After an inquiry, an investigating committee was appointed. The committee ultimately found Buhimschi guilty

of scientific misconduct. The committee report was issued in October 2004, and the finding was communicated to Yale. Buhimschi appealed the finding of scientific misconduct in January 2005. In connection with that appeal, she submitted a 31 page written submission together with 114 exhibits on January 20, 2005. Plaintiff maintains that Buhimschi launched personal attacks upon him and other WSU officials. Buhimschi's appeal was denied on February 16, 2005, and the finding of scientific misconduct became final.

Plaintiff alleges that, shortly after Buhimschi moved to Yale, in July 2003, senior officials at Yale became aware of the dispute over the authorship of the Proteomics manuscript, and the fact that WSU was investigating Buhimschi for scientific misconduct. At some point after October 2003, Buhimschi submitted a manuscript describing the research conducted at WSU in collaboration with Plaintiff to *The British Journal of Obstetrics and Gynaecology* ("BJOG"). The manuscript was accepted for publication on June 16, 2004, and published in the February 2005 issue of the BJOG. The "setting" of the study was described as a "North American University," and the only affiliations cited in the article for Buhimschi was Yale. On January 26, 2005, immediately after the article became available in electronic form, Yale issued a press release to inform the scientific committee that "Yale researchers" had made significant discoveries. Plaintiff maintains that those discoveries were made at WSU and the PRB while Buhimschi was an assistant professor at WSU, and that Yale had no connection whatever with the findings.

### D. Count I

In Count I of the First Amended Complaint, Plaintiff maintains that each of the Defendants violated Section 43(a) of the Lanham Trademark Act, 15 U.S.C. §1125(a). Specifically, he alleges that Buhimschi engaged in "reverse passing off" of the research she

conducted (with Plaintiff and others) at WSU as findings made at Yale by "Yale researchers." Plaintiff further alleges that this reverse passing off was conducted with the knowledge and approval of Yale and its agents, and in furtherance of Yale's interests and business. The reverse passing off was accomplished by: (a) "misrepresenting the research and findings in the BJOG article as research that was conducted at Yale, by Yale faculty, without any reference whatsoever to the PRB or the Plaintiff and other PRB members, and (b) by issuing a press release promoting the findings as the work of "Yale researchers" and a "Yale team" at Yale. (First Amended Complaint, Paragraph 118). Plaintiff alleges that the actions by Buhimschi and Yale were deliberate and calculated to deceive the scientific community about the origins of the research, and unjustly to enrich themselves at the expense of Plaintiff, WSU and the PRB. (First Amended Complaint, Paragraph 119). He further asserts that the conduct by Buhimschi and Yale was wilful and done in bad faith. (First Amended Complaint, Paragraph 128). Plaintiff further alleges that Weiner "was fully complicit in and assisted with this reverse passing off . . ." and that BJOG sold the article in interstate commerce with full knowledge that it contained false and misleading statements and descriptions of fact concerning the underlying research.

Defendant Yale University maintains that Plaintiff's First Amended Complaint fails to state a claim for "reverse palming off" under Section 43(a) of the Lanham Act. All of the other Defendants have joined in that position and adopted the same analysis. Yale cites Dastar Corp. v, 20th Century Fox Film Corp., 539 U.S. 23 (2003) for the proposition that Section 43(a) does not provide a cause of action for reverse palming off of intellectual property. In that case, 20th Century Fox Film Corp. was granted exclusive television rights to a copyrighted book by General Dwight D. Eisenhower about World War II. Fox arranged

for Time, Inc., to produce a "Crusade in Europe" television series based on the book, and Time assigned its copyright in the series to Fox. Fox failed to renew the copyright on the television series, which expired in 1977, leaving the material in the public domain. In 1988, Fox reacquired the television rights to "Crusade in Europe", including the right to distribute the television series on video. In 1995, Dastar released a video set which it produced from tapes of the original version of the Fox television series, and marketed the product as its own for a substantially lower price. Fox initiated a legal action, alleging, in part, that Dastar's sale of its collection without proper credit to the original series constituted reverse passing off in violation of Section 43(a) of the Lanham Act. The district court granted summary judgment to Fox, and was affirmed by the 9th Circuit Court of Appeals. The Supreme Court, however, reversed, holding that Section 43(a) does not prevent the unaccredited copying of an uncopyrighted work. The Court examined the purpose of the Lanham Act, and concluded that the statutory phrase "origin of goods" referred only to "the producer of the tangible product in the marketplace . . .." Dastar, 539 U.S. at 32.

> [A]s used in the Lanham Act, the phrase "origin of goods" is in our view incapable of connoting the person or entity that originated the ideas or communications that "goods" embody or contain. Such an extension would not only stretch the text, but it would be out of accord with the history and purpose of the Lanham Act and inconsistent with precedent.

Id. The Court declined to accord special treatment to communicative products under the provisions of the Lanham Act because it would lead "to conflict with the law of copyright, which addresses that subject specifically." 539 U.S. at 33.

> Reading "origin" in Section 43(a) to require attribution of uncopyrighted materials would pose serious practical problems. Without a copyrighted work as the base point, the word "origin" has no discernable limits.

*               *               *

      In many cases, figuring out who is in the line of "origin" would
be no simple task.

                        *               *               *

      We do not think that the Lanham Act requires this search for
the source of the Nile and all its tributaries.

Dastar, 539 U.S. at 35.

      In sum, reading the phrase "origin of goods" in the Lanham Act
in accordance with the Act's common-law foundations (which
were <u>not</u> designed to protect originality or creativity), and in
light of the copyright and patent laws (which <u>were</u>), we
conclude that the phrase refers to the producer of the tangible
goods that are offered for sale, and not to the author of any
idea, concept, or communication embodied in those goods. Cf.
17 U.S.C. §202 (distinguishing between a copyrighted work
and "any material object in which the work is embodied").  To
hold otherwise would be akin to finding that Section 43(a)
created a species of perpetual patent and copyright, which
Congress may not do.  See, <u>Aldred v. Ashcroft</u>, 537 U.S. 186,
208, 123 S.Ct. 769, 154 L.Ed. 2nd 683 (2003).

539 U.S. at 37 (emphasis in original).

      In response to Yale's arguments, Plaintiff takes issue with the proposition that the

Supreme Court in <u>Dastar</u> held that Section 43(a) of the Lanham Act does not provide a

cause of action for reverse passing off of intellectual property.  He relies upon the

observation in the opinion that Fox's claim "would undoubtedly be sustained if <u>Dastar</u> had

bought some of New Line's Crusade videotapes and merely repackaged them as its own."

539 U.S. at 31.  Plaintiff concedes that the Court's interpretation of the term "origin of

goods" was that it "refers to the producer of the tangible goods that are offered for sale, and

not the author of any idea, concept, or communication embodied in those goods."

(Plaintiff's Response, page 11 (quoting <u>Dastar</u>, 539 U.S. at 37)).  Nonetheless, he argues

that "the Court said absolutely nothing about the origin of intellectual property in a geographical or associational sense . . .." <u>Id</u>. From that statement, I take it that Plaintiff contends that the Lanham Act provides a remedy for the "geographical or associational" origin of intellectual property, but not for the "person or entity that originated the ideas or communications."

I find Plaintiff's argument very strange indeed. It strikes me as highly unlikely that a statute which provides no cause of action to a living, breathing author of ideas or communications would afford protection to the geographical region or associates of that author. Sorting out such entanglements is precisely the "search for the Nile and all its tributaries" that the Court in <u>Dastar</u> took pains to avoid. Furthermore, Plaintiff maintains this action as an individual, not as ambassador for a region or as representative of an association. As Defendant Yale has correctly observed, Plaintiff lacks standing to assert Lanham Act claims on behalf of others. See <u>Frisch's Restaurants, Inc. V. Elby's Big Boy of Steubenville, Inc.</u>, 670 F.2d 642, 649 (6th Cir. 1982) (requiring a "reasonable basis for the belief that Plaintiff is likely to be damaged.").

In its reply brief, Yale maintains that Plaintiff's "repackaging" allegation remains, at its essence a claim for failure of attribution. Defendant argues that the "repackaging" discussed in the portion of the <u>Dastar</u> decision relied upon by Plaintiff was merely a description of a classic reverse passing off scenario in which "company A puts a product on the market under A's name and the public comes to associate the product with A. Company B then takes the product, removes A's name, and replaces it with B's name, thus confusing or deceiving the public about the product's source." (Yale Reply Brief, page 1).

The example employed by Justice Scalia in <u>Dastar</u> involved the mere repackaging of a tangible product (videotapes) in the marketplace. That such circumstances would

support a Lanham Act claim is of no benefit to Plaintiff here, who seeks to stretch the scope

of Section 43(a) protections to include the geographical or associational origins of ideas or

communications that "goods" in the marketplace might embody or contain.  I agree with

Yale that Plaintiff's purported effort to protect the geographical or associational "origin of

goods" is simply another form of failure of attribution claim.

> But as used in the Lanham Act, the phrase "origin of goods" is
> in our view incapable of connoting the person or entity that
> originated the ideas or communications that "goods" embody
> or contain.  Such an extension would not only stretch the text,
> but would be out of accord with the history and purpose of the
> Lanham Act and inconsistent with precedent.

Dastar, 539 U.S. at 32-33.  Plaintiff's arguments notwithstanding, the clear message of

Dastar is that the phrase "origin of goods" in the Lanham Act does not require attribution

of uncopyrighted materials on any basis, personal, geographical or associational.

> In many cases, figuring out who is in the line of "origin" would
> be no simple task.

> *          *          *

> We do not think the Lanham Act requires this search for the
> source of the Nile and all its tributaries.

Plaintiff asserts that "[t]he U.S. Supreme Court cannot have meant to place its

*imprimatur* on this kind of thievery by intending 'repackaging' to be interpreted so narrowly

and literally as to apply only to the vehicle for the intellectual property and not to the

intellectual property itself."  I am satisfied, however, that the Court meant what it said - that

the Lanham Act was not designed to protect originality or creativity (unlike copyright and

patent laws), and that the phrase "origin of goods" in Section 43(a) "refers to the producer

of the tangible goods that are offered for sale, and not to the author of any idea, concept

or communication embodied in those goods."  Dastar certainly is not an *imprimatur* for

plagiarism - it is simply a declaration that the Lanham Act is not a proper vehicle for combating it.

Accepting all the allegations in the First Amended Complaint as true for purposes of analysis, I find that the Lanham Act claim (Count I) against Defendant Yale University fails to state a claim upon which relief may be granted, and that it must be dismissed. Because the Count I claims asserted against the remaining Defendants, all of whom have adopted Yale's arguments, are untenable for the same reasons, I recommend that their respective Motions to Dismiss be granted as to Count I as well.

**E.** **Count II - Implied-in-Fact Contract**

Count II of the First Amended Complaint alleges that Buhimschi breached an Implied in Fact Contract under which she had agreed to list Plaintiff and other PBR members involved in the collaborative research "as co-authors on any scientific articles published in peer review journals describing the collaborative research and the results obtained by that research, and accredit their affiliation with PRB." (First Amended Complaint, Paragraph 131). Plaintiff claims that the "actions, understandings and agreements of Buhimschi" and himself created the implied-in-fact contract. (Id.).

At the outset, it must be observed, once again, that Plaintiff has filed this action as an individual, and nothing in the First Amended Complaint establishes standing on his part to represent PRB or any other individual or entity. "A contract is implied-in-fact where the intention as to it is not manifested by direct or explicit words between the parties, but is to be gathered by implication or proper deduction from the conduct of the parties, language used or things done by them . . .." Ford v. Blue Cross and Blue Shield of Michigan, 150 Mich.App. 462 (1986).

> The essential elements of a contract are parties competent to contract, a proper subject matter, legal consideration, mutuality of agreement, and mutuality of obligation. An implied contract must also satisfy the elements of mutual assent and consideration.

Mallory v. City of Detroit, 181 Mich.App. 121 (1989). (Citations omitted). In this case, Defendant Buhimschi rightly observes that an implied contract in fact requires the same elements as an express contract. (Defendant's Brief, Page 3). Buhimschi argues that the First Amended Complaint fails to state a claim because it does not allege facts sufficient to establish the elements of consideration and mutual assent. (Defendant's Brief, Pages 3-4). Plaintiff is dismissive of Defendant's consideration argument. He asserts that his allegations make it "crystal clear" that he and Buhimschi collaborated on clinical research and that Plaintiff provided Buhimschi with the very materials and resources without which the work could not have been performed, and that he "contributed to the design of the research and the interpretation of the results." (Plaintiff's Brief, Page 7).[1]

> A learned judge [Cardozo, C.J., in Allegheny College v. Nat'l Chautauqua Co. Bank, 246 N.Y. 369, 159 N.E. 173 (1927)] has identified the three elements which must occur before a promise is supported by consideration.

> > (a) The promisee must suffer legal detriment; that is, do or promise to do what he is not legally obligated to do; or refrain from doing or promise to refrain from doing what he is legally privileged to do.

> > (b) The detriment must induce the promise. In other words the promisor must have made the promise because he wished to exchange it at least in part for the detriment to be suffered by the promisee.

---

[1] The parties' briefs cite references to the original Complaint. The case is currently at issue, however, on Plaintiff's First Amended Complaint.

> (c) The promisee must induce the detriment.
> This means in effect . . . that the promisee must
> know of the offer and intend to accept.

Lawrence v. Ingham County Health Department, 160 Mich.App. 420, 408 N.W. 2nd 461

(1987). [Footnotes omitted].

The First Amended Complaint asserts that Plaintiff's claims arise from collaborative

research with Buhimschi and others. Plaintiff, a physician subspecializing in maternal-fetal

medicine, was at all relevant times the chief of the Perinatology Research Branch ("PRB")

of the National Institute of Child Health and Human Development ("NICHD"), and a tenured

member of the National Institutes of Health ("NIH"). (Amended Complaint, Paragraph 1).

His main job was to "formulate, develop, and execute a research agenda for the PRB to

fulfill its mission." (First Amended Complaint, Paragraph 25). The collaborative research

in question was done pursuant to protocols approved by Wayne State University ("WSU")

and NICHD. (First Amended Complaint, Paragraph 32). Plaintiff alleges that the research

could not have been done independent of PRB. A fair reading of the First Amended

Complaint suggests that the research in question was conducted pursuant to an express

contract. The claim asserted in Count II, however, is premised upon a contract implied-in-

fact and pertaining to an article written about the completed collaborative research. In his

response brief, Plaintiff argues that the required consideration for Buhimschi's alleged

promise to designate him as co-author of the article was his contribution to the underlying

research. (Plaintiff's Brief, Page 7).

Buhimschi argues that Plaintiff's contribution to the collaborative research could not

serve as consideration for a separate, implied-in-fact contract between himself and

Buhimschi regarding attribution in any article describing the project and its results. (Defendant's Reply Brief, Page 2, Footnote 1). I agree.

The "consideration" described in Plaintiff's Response, that is, his contribution to the collaborative research, was the fulfillment of his obligation under the agreement for that project itself. Romero was simply performing his duty to his employer, PRB, and to his fellow researchers to contribute to the project, in exchange for their promise to contribute as well. Under Michigan law, "it is well settled that doing what one is legally bound to do is not consideration for a new promise." Detroit Edison Co. v. Osburn Trucking, Inc., 2001 WL 1167171 (unpublished) (quoting Yerkovich v. AAA, 461 Mich. 732, 740 (2000); citing Puett v. Walker, 332 Mich. 117, 122 (1952)). The principle applies whether the pre-existing duty is statutory, Richmond v. Catholic Social Services, 2004 WL 1416266 (unpublished) (citing General Aviation, Inc. v. Capital Region Airport Authority (on remand), 224 Mich.App. 710, 715 (1997)), or whether it is contractual, Yerkovich, 461 Mich.App. 732 (2000). Furthermore, it applies whether the alleged implied in fact contract is characterized as a modification of an existing express agreement, Yerkovich, supra, or a new and independent agreement, Puett, supra. Thus, I conclude that the only "consideration" identified by Plaintiff in his reply brief was the performance of his obligation under the research collaboration agreement and his employment agreement with PRB. Such performance is not sufficient consideration to support a second contract relating to the scholarly publication of the results of the research.

Buhimschi also argues that the essential element of mutuality is lacking in the alleged implied in fact contract. Nothing identified by Plaintiff in his brief describes any obligation undertaken by Romero in exchange for the alleged promise by Buhimschi to name him as a co-author of the article. Absent such mutuality of obligation, no contract,

express or implied, could exist. <u>Johnson v. Douglas</u>, 281 Mich. 247, 256 (1937) (mutuality of obligation is an essential element of every contract).

Plaintiff asserts in his brief that Buhimschi "manifested her agreement" to designate him as a co-author "by de facto making Plaintiff an author first of an abstract and then of the manuscript submitted to The Lancet . . .." Romero claims that such conduct demonstrates that "there was a meeting of the minds over the question of authorship." (Plaintiff's Brief, Page 7).

Buhimschi argues that, under Michigan law, "a plaintiff must adequately plead mutual assent and consideration in order to establish the existence of a valid contract capable of being breached." She cites <u>Lawrence v. Ingham County Health Department</u>, 160 Mich.App. 420 (1987). In that case, the trial court found that the plaintiff failed to state a cause of action for breach of contract and granted summary disposition in favor of the defendant. "The trial court concluded that plaintiff failed to plead facts that would support a finding of adequate consideration and that plaintiff's contract claim must therefore fail." 160 Mich.App. at 463. The Court of Appeals determined that, "[i]n order for [the plaintiff's] promise to rise to the level of consideration sufficient to support a contract implied in fact, . . . that promise must be of some value to defendant. . .." In <u>Lawrence</u>, plaintiff asserted that her promise to follow medical advice was consideration for the defendant clinic's promise to render such advice. The Court of Appeals upheld the dismissal on the ground that the defendant gained no benefit from the plaintiff's promise, so that her acceptance of the medical advice could not be deemed consideration sufficient to form a contract. 160 Mich.App. at 425.

In the case at bar, the only consideration identified by Plaintiff in his Brief in Response to Buhimschi's Motion to Dismiss is Romero's work in furtherance of the

collaborative research. In addition to being part of his employment obligation to "PRB"

Plaintiff's work on the research was exchanged for the work of Buhimschi and others on

the same project. It could not, therefore, constitute adequate consideration for an entirely

new promise such that a separate implied-in-fact contract could arise with respect to the

scholarly article based upon the research results. Thus, under Michigan pleading

requirements, dismissal might be warranted. But Michigan procedural rules do not apply

in this case.

While a court sitting in diversity applies the substantive law of the state in which it

sits, procedural matters are governed by the Federal Rules of Civil Procedure.

Fed.R.Civ.P. 8 does not require a detailed statement of "facts" giving rise to a "cause of

action." The essential requirement of the rule is that a Complaint must provide "fair notice

of what the plaintiff's claim is and the grounds upon which it rests." Conley v. Gibson, 78

S.Ct. 99, 355 U.S. 41 (1957).

> Implicit in this passage is the notion that the rules do
> contemplate a statement of circumstances, occurrences, and
> events in support of the claim being presented. Of course,
> great generality in the statement of these circumstances will be
> permitted as long as the defendant is given fair notice of what
> is claimed; nonetheless, Rule 8(a)(2) does require that the
> pleader disclose adequate information concerning the basis of
> his claim for relief as distinguished from a bare averment that
> he wants relief and is entitled to it.

Wright and Miller, Federal Practice and Procedure, Civil 3rd Section 1215. At Paragraph

49 of the First Amended Complaint, Plaintiff quotes Buhimschi as stating that he (Plaintiff)

"participated in the design of the study, supervised the clinical assessments, and assisted

with the interpretation of data and preparation of the paper." In assessing a Motion to

Dismiss, the Court "must construe the Complaint in the light most favorable to the plaintiff,

accept all factual allegations as true, and determine whether the plaintiff undoubtedly can prove no set of facts in support of his claims that would entitle him to relief." Allard v. Weitzman, (In Re: DeLorean Motor Company), 991 F.2d 1236, 1239-40 (6th Cir. 1993) (citing Meador v. Cabinet for Human Resources, 902 F.2d 474, 475 (6th Cir.), cert. denied, 498 U.S. 867 (1990)); see also, Conely v. Gibson, 355 U.S. 41 (1957).   Romero's assistance with the preparation of the scholarly manuscript has not been shown to have been undertaken as part of a pre-existing duty.  Accordingly, it could conceivably constitute adequate consideration for a separate promise on Buhimschi's part to list Romero as co-author of the article.  Affording Plaintiff the full benefit of the Rule 12(b)(6) policy, and the most liberal interpretation of the First Amended Complaint, I am not prepared to conclude that there is no set of facts which could support a recovery.   Accordingly, I must recommend that Buhimschi's Motion to Dismiss be denied as to Count II.   If, after discovery, there is no evidence to support an essential element of Plaintiff's implied-in-fact contract claim, Buhimschi may file a Motion for Summary Judgment pursuant to Fed.R.Civ.P. 56.

#### F.  Count III

Count III of the First Amended Complaint asserts a claim of negligence against Defendant Royal College of Obstetricians and Gynaecologists.  The negligence claim relates to RCOG's publication in its journal, *The British Journal of Obstetrics and Gynaecology* ("BJOG"), of the article submitted to it by Buhimschi.  RCOG maintains that Plaintiff's negligence claim is simply a poor substitute for a defamation action.  It is quite clear, however, that Plaintiff is asserting in Count III a claim of negligence.

Defendant cites numerous cases in which courts have refused to recognize claims of "negligent publication" on First Amendment grounds.  In Winter v. G.P. Putman's Sons,

938 F.2d 1033 (9th Cir. 1991), the Ninth Circuit Court of Appeals held that a book publisher has no duty to investigate the accuracy of the contents of a book which it published, and that the plaintiff could not recover against the publisher under a negligence theory. The basis of that holding was the court's conclusion that a legal duty to the Plaintiff is an essential element of a negligence claim. Citing opinions from many jurisdictions, the court noted that the "cases uniformly refused to create this duty." Winter, 938 F.2d at 1037. Included in the cited cases was Lewin v. McCreight, 655 F.Supp. 282 (E.D. Mich. 1987) in which Judge Churchill determined that neither the Michigan Products Liability Statute nor the common law of this State imposes a duty upon a publisher to warn of "defective ideas" in a book published by it but written by a third person. In response, Romero asserts that:

> Plaintiff is not suing BJOG for negligence because of any inaccuracies in the text of the Proteomics article - that is, in the ideas or results reported. He is suing because BJOG published a manuscript knowing its authorship was disputed without even contacting him to hear his version of the facts on which [Defendant's editor] relied, and then failed to retract the article or correct information it was told was false.

(Plaintiff's Brief Opposing Defendant Royal College of Obstetricians and Gynecologists pursuant to Fed.R.Civ.P. 12(b)(6), pages 12-13).

Plaintiff concedes that his claims against BJOG cannot survive a challenge under Fed.R.Civ.P. 12(b)(6) unless the conduct of the Defendant violated a legal duty owed to him. He attempts to establish the existence of that duty in two ways. First, he maintains that the BJOG editorial staff violated the *Uniform Requirements for Manuscripts Submitted to Biomedical Journals ("Uniform Requirements")* promulgated by the International Committee of Medical Journal Editors. (Plaintiff's Exhibit 26). He invokes that portion of the requirements providing that individuals who submit manuscripts for publication must list

all those who qualify for authorship. Plaintiff's theory is that BJOG, having adopted the standards, had a duty to ensure that the guidelines were met. Plaintiff acknowledges that the duty of a scientific journal is normally discharged by "asking authors to sign and Author Guarantee Form." (See Defendant's Exhibit C). BJOG did obtain such a guarantee form from Buhimschi. Plaintiff, however, argues that, having been placed on notice that the authorship of the manuscript submitted by Buhimschi was disputed, Defendant had an additional duty under the Uniform Standards to investigate and resolve the authorship dispute, or to withhold publication until the dispute was otherwise resolved.

Plaintiff further bases his negligence claim upon BJOG's membership in the World Association of Medical Editors ("WAME") and the Committee on Publication Ethics ("COPE"), each of which has adopted standards and practices to be observed by scientific journals. Plaintiff notes that *The Lancet,* which is also a member of WAME and COPE, declined to publish the first Buhimschi manuscript until the authorship dispute was resolved. He further notes that, after he demanded a correction/retraction from BJOG, the Defendant consulted COPE, which opined that the article should not have been published before the authorship dispute was resolved. (Plaintiff's Exhibit 29).

Plaintiff maintains that courts generally hold members of a calling to the standards and practices accepted by that calling, unless the standards deviate from reasonable practice. He cites T.J. Hooper v. Northern Barge Corp., 60 F.2d 737 (1932) in which the Second Circuit imposed liability upon the operators of tugboats, based upon their failure to equip the vessels with radios capable of receiving weather reports. The court imposed liability for the weather related loss of barges and cargo, despite the fact that most tugboat operators did not equip their boats with radios. I find Plaintiff's argument unpersuasive.

In <u>Hooper</u>, the defendant's legal duty to the plaintiffs arose in the context of a direct business relationship. The law of contract imposed the requirement that the vessels be sufficiently seaworthy to fulfill the undertaking. Judge Hand considered, and <u>rejected</u> the industry standard as a measure of seaworthiness.

In the case at bar, Plaintiff urges this court to find that the publication standards of private organizations to which Defendant RCOG voluntarily subscribed actually created a legal duty to Plaintiff. A federal court sitting in diversity must apply the substantive law of the forum state. <u>Erie R.R. Co. v. Tompkins</u>, 304 U.S. 64 (1938). In Michigan, the existence of a legal duty is a question of law. <u>Beaudrie v. Henderson</u>, 465 Mich. 124 (2001). Plaintiff has cited no Michigan statute or court decision supporting his conclusion that the voluntary adoption of private standards of conduct create a legal duty. There is, however, Michigan case law to the contrary. In <u>Adkins v. Mong</u>, 168 Mich.App. 726, 730 (1988), the plaintiff argued that a pharmacist owed a customer a legal duty to monitor drug usage, relying upon the standards of practice adopted by the American Pharmaceutical Association and upon an article published in a professional periodical. The court found that no such duty arose by reason of such non-legal authorities. The court declined to find a legal duty despite the fact that a direct commercial relationship existed between the pharmacist and the customer. In the case at bar, Plaintiff assumes the existence of a duty in the absence of any such relationship. In my view, his argument is even weaker than that rejected by the Michigan Court of Appeals in <u>Adkins</u>. I conclude that no legal duty to Plaintiff arose by reason of RCOG's voluntary adoption of private publication standards. Alternatively, Plaintiff argues that RCOG owed him a duty of reasonable care as a matter of public policy. He reminds the court of its responsibility to continue the development of the common law.

In following the mandate of <u>Erie R.R. Co. v. Tompkins</u> to apply the substantive law of the forum, a federal court "must follow the decisions of the state's highest court when that court has addressed the relevant issue." <u>Talley v. State Farm Fire and Casualty Co.</u>, 223 F.3d 323, 326 (6th Cir. 2000). When the State Supreme Court has not yet decided a particular issue, the federal court must "anticipate how that court would rule." <u>Imperial Hotels Corp. v. Dore</u>, 257 F.3d 615, 620 (6th Cir. 2001) (quoting <u>Bailey Farms, Inc. v. NOR-AM Chem. Co.</u>, 27 F.3d 188, 191 (6th Cir. 1994). In doing so, the court must consider decisions of a state's intermediate appellate courts unless it is "convinced by other persuasive data that the highest court of the state would decide otherwise." <u>West v. AT&T Co.</u>, 311 U.S. 223, 237 (1940); see also, <u>Comm'r v. Bosches Estate</u>, 387 U.S. 456, 465 (1967). As stated above, an intermediate appellate court of the State of Michigan has determined that non-legal standards of conduct adopted by private institutions impose no legally enforceable duty. Plaintiff has offered no persuasive evidence or argument to suggest that the Michigan Supreme Court would decide the issue differently. He merely urges this court to impose a different legal standard upon our forum state based on what he believes are policy imperatives. Federal courts sitting in diversity are in a particularly poor position to endorse a fundamental policy innovations. Absent some authoritative signal from the legislature or the courts of the forum state, there is no basis even for considering the pros and cons of innovative theories. <u>Combs v. International Ins. Co.</u>, 354 F.3d 568 (6th Cir. 2004). Plaintiff had the option of filing this action in a Michigan court. If his purpose was to redefine and develop the state common law, he should have done so. This court is bound to apply state law as it currently exists, and the adoption of innovative theories of recovery is inappropriate in the exercise of diversity jurisdiction. <u>Solomon v. Walgreen Co.</u>, 975 F.2d 1086, 1089 (5th Cir. 1992).

I conclude that Count III of the First Amended Complaint fails to state a claim upon which relief may be granted, and I recommend that Count III be dismissed.

### G. Count IV

Count IV of the First Amended Complaint alleges that Defendant Carl Weiner tortiously interfered with Plaintiff's advantageous relationship with BJOG. Plaintiff alleges that BJOG's adoption of the Uniform Requirements for Manuscripts submitted to Biomedical Journals ("Uniform Requirements"), created a "reasonable expectancy" in all who have contributed to research published in a biomedical journal that they would be properly acknowledged. The Complaint further alleges that the adoption of the uniform standards created an "advantageous relationship" between Plaintiff and BJOG. (First Amended Complaint, Paragraphs 148-151). Under Plaintiff's theory, Defendant Weiner made false statements to BJOG's editor (Thornton) with the intent of undermining Plaintiff's status as a contributor to the research which was the subject of Buhimschi's article. It is alleged that Weiner knew his representations to be false, or that he recklessly disregarded the truth or falsity of his statements. Count IV asserts that Weiner convinced Thornton of the truth of his statements, and thus "tortiously interfered with the Plaintiff's advantageous relationship and reasonable expectancy." (First Amended Complaint, Paragraph 154). Plaintiff claims that Weiner's tortious interference "was a proximate cause of harm to the Plaintiff's reputation and caused him aggravation, humiliation, and embarrassment." (First Amended Complaint, Paragraph 155).

To state a case under Count IV, Plaintiff must establish the following: 1) the existence or expectancy of a valid business relationship between Plaintiff and BJOG; 2) that Defendant Weiner knew of the relationship; and 3) that Weiner's action induced a

breach or termination of the expectancy, which caused damage to Plaintiff. <u>Bonelli v. Volkswagon of America, Inc.</u>, 106 Mich.App. 483 (1988).

Defendant Weiner argues that Plaintiff's allegations fail to state a claim for tortious interference with a business expectancy. Weiner maintains that Count IV is defective in several particulars. First, Plaintiff does not allege that he personally had a contract or the prospect of doing any business with BJOG. Second, Plaintiff fails "to allege how he was damaged by the publication of the article without his name." (Weiner Brief, Page 6). Weiner further argues that Plaintiff must allege specific facts to prove an improper motive for the claimed interference in order to establish that Weiner's actions were unjustified.

In response, Plaintiff maintains that Count IV satisfies all the elements required for a compensable claim of tortious interference with an advantageous relationship. With respect to the specific shortcomings raised by Weiner's motion, Plaintiff states that he "has alleged that he had an expectation of entering into an advantageous relationship with BJOG . . .." (Plaintiff's Brief, Page 11). He further asserts that Weiner was aware of the expectancy, that he intentionally interfered with it by making false statements to BJOG, and that the Defendant's conduct "was the proximate cause of harm to the Plaintiff." <u>Id</u>. Plaintiff rejects any suggestion that his expectancy must relate to a transaction that involves the exchange of money. He claims to be in the business of medical research, and maintains that his job performance is evaluated on the basis of his research productivity. Thus, he claims that "[t]o interfere using improper means . . . with the ability of an academic to publish research is to interfere with an advantageous business relationship." <u>Id</u>. Furthermore, he argues that he will be required to explain to his employer (PRB) "why the PRB published no articles on Proteomics in premature labor . . .." He cites <u>Joba</u>

Construction Co. v. Burns and Roe, Inc., 121 Mich.App. 615 (1982) for the proposition that the recovery of exemplary damages is appropriate. (Plaintiff's Brief, Page 12).

I find that Defendant Weiner has the better argument. The First Amended Complaint plainly relies upon BJOG's adoption of the Uniform Requirements as the basis of the "reasonable expectancy" and "advantageous relationship with BJOG" with which Weiner is alleged to have interfered. Just as the voluntary adoption of private standards of conduct creates no legal duty, I am satisfied that it creates, in itself, no legally cognizable expectancy of recognition or advantageous business relationship. In Schipani v. Ford Motor Co., 102 Mich.App. 606 (1981), a case cited in the opinion relied upon by Plaintiff, the Michigan Court of Appeals held that a plaintiff "must assert a specific and reasonable prospective economic advantage that was interfered with" in order to survive a summary judgment motion. Schipani, in turn, relied upon Behrend v. Bell Telephone Co., 363 A.2d 1152 (1986) for the proposition that:

> [T]he tort of intentional interference with business requires, as a basis, that a business relationship be proved with some degree of specificity, at least to the point that future profit be a realistic expectation and not merely wishful thinking. It is true that where a prospective advantage is alleged, the plaintiff need not demonstrate a guaranteed relationship because 'anything that is prospective in nature is necessarily uncertain. We are not here dealing with certainties, but with reasonable likelihood or probability. This must be something more than a mere hope or the innate optimism of the salesman.'

Behrend, 363 A.2d at 1160. There is no allegation in Plaintiff's First Amended Complaint that he had any business relationship whatsoever with BJOG beyond the hope of benefit accruing from the latter's adherence to the uniform standards. To my mind, that is nothing "more than the mere hope or the innate optimism" to which the Behrend opinion referred. Without support for a legitimate inference of "a specific and reasonable prospective

economic advantage that was interfered with," Count IV simply fails to state a claim upon which relief may be granted.  I agree with the Defendant that "[i]n the absence of a valid business relationship with a specified third party and a reasonable expectation of a future profit from such relationship, Romero has not stated a claim for tortious interference with advantageous relationships . . .."  I recommend that Count IV of the First Amended Complaint be dismissed.

### H.   Count V

Count V of the First Amended Complaint charges Defendants Buhimschi and Yale with defamation.  Plaintiff attributes 34 separate and allegedly defamatory statements to Buhimschi.  (First Amended Complaint, Paragraph 59).  He claims that Buhimschi published those false statements to WSU on January 20, 2005.  (First Amended Complaint, Paragraph 160).  Plaintiff further alleges that Buhimschi republished these false statements to the BJOG on March 14, 2005, and that she was acting within the scope of her employment and furthering the interests of her employer, Yale, when she did so.  (First Amended Complaint, Paragraphs 161-62).  Furthermore, Plaintiff alleges "on information and belief," that Buhimschi republished the statements to Yale (First Amended Complaint, Paragraph 167), although the date and place of such republications is unspecified.  It is further alleged that Yale "ratified" the statements.  (Id.).

Defendants Buhimschi and Yale University maintain that Plaintiff's action for defamation based upon Buhimschi's January 20, 2005 letter to Wayne State University, as well as her alleged publication of false statements prior to that date, is barred by the one year statute of limitation imposed by MCLA 600.5805(8).  Defendants further allege that the balance of Plaintiff's claims in Count V fail to meet the requirement of Michigan law that a

plaintiff plead defamation with specificity.  The Defendants further maintain that Plaintiff is a "limited purpose public figure" under the law relating to defamation, and that he was thus required to allege facts which would support an inference of actual malice.

In response, Plaintiff concedes that Michigan's statute of limitations on defamation claims is one year.  He argues, however, that Buhimschi's alleged publication of defamatory statements about him to the BJOG on March 14, 2005 created a "new cause of action on which the statute of limitations starts to run afresh." (Plaintiff's Response Brief, Page 5).  Plaintiff further argues that he pleaded his defamation claim with sufficient specificity.  Finally, Plaintiff maintains that he is not a limited purpose public figure, and thus he needs only to prove negligence to make out a case for defamation.  MCLS 600.2911 (2006).

Under Michigan law, the elements of a defamation claim are: (1) a false and defamatory statement concerning the Plaintiff, (2) an unprivileged communication to a third party, (3) fault amounting to at least negligence on the part of the publisher, and (4) either actionability of the statements irrespective of special harm (defamation *per se*) or the existence of special harm caused by the publication.  <u>Rouch v. Enquirer and News of Battle Creek</u>, (after remand), 440 Mich. 238, 251 (1992).

M.C.L. Section 600.5805(1), (9) provides as follows:

> (1) A person shall not bring or maintain an action to recover damages for injuries to persons or property unless, after the claim first accrued to the plaintiff or to someone through whom the plaintiff claims, the action is commenced within the periods of time prescribed by this section.
>
> *          *          *
>
> (9) The period of limitations is one year for an action charging libel or slander.

M.C.L. Section 600.5805(1) and (9).

Based upon the foregoing statutory provisions, it is clear that Plaintiff's defamation claims against Buhimschi based upon her allegedly defamatory statements about Plaintiff to Wayne State University on January 20, 2005 (First Amended Complaint, Paragraph 160), and her publication of "some of these false statements" prior to January 2005 to *The Lancet* and officials at the NIH and WSU (First Amended Complaint, Paragraph 166) are barred. Plaintiff does not appear to contest this conclusion in his Response Briefs to the Motions by Buhimschi and Yale University. The only claims in Count V remaining for discussion concern Buhimschi's alleged republication of the same statements to the BJOG on March 14, 2005; her alleged (but undated) republication to the editorial board of BJOG and/or members of the Royal College of Obstetricians and Gynaecologists, which publication is alleged to be continuing; and Buhimschi's alleged (but again undated) republication of "these statements" to Yale, and Yale's alleged ratification of them.

All of the alleged defamation remaining for analysis occurred after Defendant Buhimschi moved to Yale, in or about July 2003. (First Amended Complaint, Paragraph 87). It is undisputed that Buhimschi was a member of the Yale faculty at the time of her alleged republication of the statements earlier issued by her in her appeal of the Wayne State University academic misconduct proceedings. She remained an agent of Yale when the disputed article was ultimately published in the BJOG. Defendant Yale emphasized that fact in its press release following the publication of the article. The First Amended Complaint asserts that Plaintiff made Yale aware of his dispute with Buhimschi over the article, and asserts "on information and belief" that Buhimschi and Yale discussed that subject matter. Plaintiff has asserted that Buhimschi's alleged publication of defamatory statements about him in connection with her submission of the article to the BJOG was

within the scope of her employment by Yale, such that the latter is liable for those acts of defamation on theories of ratification and/or respondeat superior.

Yale cites several Michigan court cases standing for the proposition that a plaintiff must plead defamation with specificity. See, e.g., <u>Royal Palace Homes v. Channel 7</u>, 197 Mich.App. 48, 52 (1992); <u>Gonyea v. Motor Parts Fed'l Credit Union</u>, 192 Mich.App. 74, 77 (1991).[2] Our circuit has held, however, that a technical rule of pleading defamation at common law have been abrogated by the Federal Rules of Civil Procedure.

> Under the Federal Rules, the pleader need only provide "a short and plain statement of the claim showing the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2); see also <u>Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit</u>, 113 S.Ct. 1160 (1993) (emphasizing the liberal notice requirements of the Federal Rules). Plaintiff's Complaint specifically referred to the December 1991 broadcast and to the subject matter of that broadcast. This certainly gave notice to the court and to the parties of the nature of the action and the relief sought. Thus Plaintiff adequately pled its defamation claim.

<u>Suarez v. CBS, Inc.</u>, 23 F.3d 408 (6th Cir. 1994) (Table case). In the case at bar, Plaintiff has set out in substantial detail the allegedly defamatory statements issued by Buhimschi to Wayne State, and republished by her to the BJOG on March 14, 2005 (and to Yale under unspecified circumstances). Yale argues that Plaintiff failed to indicate which of the statements originally directed to Wayne State were republished to the BJOG. The language of the Complaint, however, can be fairly read to allege that all of the statements were repeated. Yale further argues that not all of the statements listed in the First Amended Complaint are defamatory, and I agree. Some of them, however, may be

---

[2] Defendants Yale and Buhimschi each filed a Motion to Dismiss. As to Count V, Buhimschi adopts the arguments offered by Yale in its Motion.

reasonably interpreted as such, and if any would support a claim of defamation, dismissal of the entire count is inappropriate.

Finally, Yale argues that Plaintiff is a limited public figure, and is required to plead "actual malice." Plaintiff denies that he is a limited public figure, but maintains that the facts pleaded in the First Amended Complaint are sufficient to meet such a heightened pleading requirement. The First Amended Complaint plainly alleges that Buhimschi "knew that her factual defamatory allegations . . . were false when she made and published them," and that she "acted throughout with actual (common law) malice, with the specific intent of damaging Plaintiff's professional reputation and standing within his profession and the scientific community." (First Amended Complaint, Paragraphs 163, 164).

In assessing a Motion to Dismiss, the Court "must construe the Complaint in the light most favorable to the Plaintiff, accept all factual allegations as true, and determine whether the Plaintiff undoubtedly can prove no set of facts in support of his claims that would entitle him to relief." Allard v. Weitzman, (in Re: DeLorean Motor Co.), 991 F.2d 1236, 1239-40 (6th Cir. 1993) (citing Meador v. Cabinet for Human Resources, 902 F.2d 474, 475 (6th Cir.), cert. denied, 498 U.S. 867 (1990)). "A Complaint need not set down in detail all the particulars of a plaintiff's claim, but must simply give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." Lillard v. Shelby County Board of Education, 76 F.3d 716, 726 (6th Cir. 1996). It may well be that Plaintiff will be unable to present sufficient evidence to establish each essential element of his claims in Count V. Should that be the case, Defendant may seek dismissal by way of a Motion for Summary Judgment. Fed.R.Civ.P. 56. At this point, I am unable to conclude that Plaintiff can prove no set of facts which might entitle him to relief. Accordingly, I recommend that the Motions

of Defendants Yale and Buhimschi to Dismiss Count V of the First Amended Complaint be granted as to all statements (and republications) occurring more than one year before this action was filed, and denied as to statements or republications occurring on or after January 28, 2005.

I.      **Count VI**

Count VI of the First Amended Complaint asserts a claim of defamation against Defendant Carl Weiner.   The Plaintiff alleges that Weiner made factually false and defamatory statements about him in an e-mail to Thornton (Editor of BJOG) on October 10, 2003.  Count VI further alleges that Thornton republished Weiner's defamatory statements to agents of Wayne State University in or about March 2005, and to members of the BJOG editorial board in or about November 2005.  Plaintiff maintains that those republications were the natural and probable consequences of Weiner's original defamatory statements.

As stated in previous sections of this Report, a federal court sitting in diversity must apply the substantive law of the forum state.   Under Michigan law, the elements of a defamation claim are: (1) a false and defamatory statement concerning the plaintiff, (2) an unprivileged communication to a third party, (3) fault amounting at least to negligence on the part of the publisher, and (4) either actionability of the statement irrespective of special harm (defamation per se) or the existence of special harm caused by the publication. Rouch v. Enquirer and News of Battle Creek, (after remand), 440 Mich. 238, 251 (1992).

M.C.L. Section 600.5805(1), (9) provides as follows:

>  (1) A person shall not bring or maintain an action to recover damages for injuries to persons or property unless, after the claim first accrued to the plaintiff or to someone through whom the plaintiff claims, the action is commenced within the periods of time prescribed by this section.

*          *          *

        (9) The period of limitations is one year for an action charging
        libel or slander.

M.C.L. Section 600.5805(1) and (9).

       Plaintiff asserted the identical claim against Defendant Weiner in the original

Complaint in this action.  That pleading was filed on February 27, 2006, more than two

years after Weiner's alleged e-mail publication of defamatory statements about the Plaintiff

to Thornton.  (Docket Entry No. 1; Docket Entry No. 31, Paragraph 170).  Absent some

basis upon which to avoid the operation of the limitations period, Plaintiff's claim against

Weiner for his e-mail statements of October 10, 2003 is barred.  No basis upon which to

toll the operation of the statute of limitations is apparent from the face of the Complaint, or

from Plaintiff's Brief in Response to Weiner's Motion to Dismiss.

       The balance of Plaintiff's claim against Weiner in Count VI is founded upon the

alleged "republication" of Weiner's statements by Thornton, as described in Paragraphs

173-175 of the First Amended Complaint.  Plaintiff asserts that the alleged republications

"were the natural and probable consequence of the original publication," and apparently

maintains that the statute of limitations as to Weiner can be extended or re-started under

circumstances in which he could have anticipated the repetition of his remarks.  The law

of Michigan, however, appears to be to the contrary.

       In <u>Mitan v. Campbell</u>, 474 Mich. 21 (2005), the Supreme Court of Michigan held that:

        The plain language of M.C.L. Section 600.5805 is inconsistent
        with plaintiff's claim that a third party's expected republication
        of a defamatory statement effects the running of the limitations
        period for the initial statement.   The statute provides a
        relatively short limitations period of one year; there is nothing
        in the statute suggesting that the period can effectively be
        lengthened where republication is anticipated.  Rather than a

> rule of first accrual, the reasoning of the Court of Appeals
> changes the statute to a rule of last accrual.  Such reasoning
> undermines the principles of finality and certainty behind a
> statute of limitations.

474 Mich. at 25.  In Mitan, the Court of Appeals had relied upon Tumbarella v. Kroger Co.,

85 Mich.App. 482 (1978) for the proposition that one who publishes a defamatory

statement is liable for the injurious consequences of its repetition where the repetition is the

natural and probable result of the original publication.  The Mitan decision neither accepted

nor rejected the general proposition, but did observe that: "even if we were to accept the

natural and probable consequences rule, no case from our jurisdiction has held that the rule

extends the one year period of limitations." 474 Mich. 21, 25 (2005).  Because the only

defamatory publication alleged to have been made by Weiner occurred more than one year

prior to the filing of this action, and because the republication of his remarks by third

parties, even if anticipated by Weiner, does not extend the statute of limitations as to him,

Count VI of the First Amended Complaint should be dismissed.

### J.  Count VII

Count VII of the First Amended Complaint purports to state a claim against RCOG

based upon its issuance of a Statement of Disputed Authorship concerning the Buhimschi

article in its April 2006 issue of the BJOG.  The Plaintiff alleges that the statement

contained "express or implied false representations" relating to the Buhimschi article and

her scientific misconduct proceedings at WSU.  He claims that the "said omissions" were

intentional, and calculated to mislead the scientific community in order to conceal and

minimize the BJOG's intentional wrongdoing.  (First Amended Complaint, Paragraph 181).

Defendant RCOG challenges Count VII as patently unintelligible and baseless.  The

Defendant maintains that Plaintiff has failed to plead the elements of any known claim, and

argues that Plaintiff can point to no authority showing that it had any duty to him which would support a cause of action. In response, Plaintiff argues that the code of conduct for editors of biomedical journals "expressly imposes on editors to take action whenever they suspect misconduct." Plaintiff recognizes that this standard was voluntarily undertaken by members of scientific journalism organizations. In this case, he maintains that RCOG's membership in the World Association of Medical Editors ("WAME") and the Committee on Publication Ethics ("COPE") imposed a duty upon BJOG to withhold publication of an article whose authorship it knows is disputed until it has satisfied itself that the authorship is correct. Plaintiff argues in his brief that the duty was personal between BJOG and himself, and that every biomedical journal owes both the scientific committee and scientists a similar obligation.

To the extent that Plaintiff relies upon a duty imposed upon BJOG by its voluntary adoption of publication standards established by journalistic organizations to which it belongs, I find that Count VII of the First Amended Complaint fails to state a cause of action upon which relief may be granted. My reasoning is the same as that expressed in connection with Count III. Under Michigan law, the existence of a legal duty is a question of law. Beaudrie v. Henderson, 465 Mich. 124 (2001). In Adkins v. Mong, 168 Mich.App. 726, 730 (1988), the Michigan Court of Appeals determined that non-legal authorities, such as standards of practice adopted by professional organizations, and subscribed to by their members, do not confer a legal duty. Plaintiff has cited no Michigan statute or case to the contrary. This court is not free to disregard the reported case of an intermediate state court unless it is persuaded that the Michigan Supreme Court would reject the holding. Again, Plaintiff has offered nothing to suggest that the decision in Adkins v. Mong, now nearly

thirty years old, would be rejected by the Supreme Court of Michigan. Plaintiff's First Amended Complaint simply fails to allege facts under which this court could conclude that the conduct of BJOG in connection with the statement of disputed authorship violated any legal duty to Plaintiff. Accordingly, I recommend that Count VII of the First Amended Complaint be dismissed.

### K.    Conclusion

For all of the above reasons, I recommend that Defendant Buhimschi's Motion to Dismiss be granted as to Count I, denied as to Count II and granted in part as to Count V.

I recommend that Defendant Yale University's Motion to Dismiss be granted as to Count I and granted in part as to Count V.

I recommend that Defendant Weiner's Motion to Dismiss be granted as to Counts I, IV and VI.

I recommend that Defendant Royal College of Obstetrics and Gynecology's Motion to Dismiss be granted as to Counts I, III and VII.[3]

### III.    NOTICE TO PARTIES REGARDING OBJECTIONS:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. Section 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. United States v. Walters, 638 F.2d 947 (6th Cir. 1981), Thomas v. Arn, 474 U.S. 140 (1985), Howard v. Secretary of HHS, 932 F.2d 505 (6th Cir. 1991). Filing of objections that raise some issues

---

[3]  RCOG filed a second Motion to Dismiss under Fed.R.Civ.P. 12(b)(2). Should the Court accept my recommendation for dismissal of all claims against RCOG for failure to state a claim, the second motion should be denied as moot.

but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  <u>Smith v. Detroit Federation of Teachers Local 231</u>, 829 F.2d 1370, 1373 (6th Cir. 1987), <u>Willis v. Secretary of HHS</u>, 931 F.2d 390, 401 (6th Cir. 1991).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall not be more than five (5) pages in length unless by motion and order such page limit is extended by the Court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.

s/Donald A. Scheer
DONALD A. SCHEER
UNITED STATES MAGISTRATE JUDGE

DATED: May 22, 2007

---

## CERTIFICATE OF SERVICE

I hereby certify on May 22, 2007 that I electronically filed the foregoing paper with the Clerk of the Court sending notification of such filing to all counsel registered electronically.  I hereby certify that a copy of this paper was mailed to the following non-registered ECF participants on May 22, 2007. **None.**

s/Michael E. Lang
Deputy Clerk to
Magistrate Judge Donald A. Scheer
(313) 234-5217
