UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROBERTO ROMERO,

       Plaintiff,

v.

IRINA BUHIMSCHI and YALE
UNIVERSITY,

       Defendants.

_____/

Case No. 2:06-cv-10859

HONORABLE STEPHEN J. MURPHY, III

**OPINION AND ORDER GRANTING DEFENDANTS' MOTIONS
FOR SUMMARY JUDGMENT** (docket nos. 95 & 97) **AND  DENYING
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT** (docket no. 90)

## INTRODUCTION

Despite the number of controversies in that result in litigation, there remain some disputes that fall outside the realm of the courts, and wrongs that are not redressable by law or equity.  This case involves such a dispute, and if any wrong was committed here, its proper remedy should be sought outside of the courthouse.

This suit is, at its core, a dispute over the attribution of authorship of certain medical research, and of scholarly articles and presentations publishing that research.  The plaintiff Dr. Roberto Romero claims that one of the defendants, Dr. Irina Buhimschi, published medical research on which they had collaborated without attributing authorship to Romero. This publication, he says, was a breach of an implicit contract between the two of them, whereby he would collaborate on the research and she would attribute authorship to him. Romero also claims that after he complained of this to various academic and scholarly

institutions, Buhimschi and her employer, Yale University, responded with a series of libelous accusations.[1]

Although Romero's contract and defamation claims are related to each other, they involve fairly discrete sets of facts, each of which is relatively complex.  Therefore, the Court will discuss the facts related to each claim separately.

**CONTRACT CLAIM**

I.  Facts

The facts of the case are disputed at many points, but the parties appear to agree on the basics.  The plaintiff, Dr. Roberto Romero, was and is the Chief of the Perinatology Research Branch of the National institute of Child Health and Human Development (hereinafter "the PRB"), which at all relevant times was housed at Wayne State University in Detroit.  Although this housing arrangement was temporary and informal at first, in October 2002 Wayne State was awarded a multimillion-dollar contract to be the long-term home of the PRB.

Romero has no written employment contract with the PRB, but the record indicates that his employment is designated as being of "indefinite" duration, and he has been granted tenure of a type similar to that used by universities.  Romero dep., docket no. 95, ex. A, p. 11.  According to Romero, his job duties include "participat[ion] in the drafting of manuscripts, abstracts, and other scientific endeavors of that nature."  *Id.* p. 20.  He is "involved in the scientific process on a daily basis," *id.* p. 21, and estimates that "at least" half his time is spent planning research, participating in projects, editing manuscripts, and

---

[1]  Romero's complaint also included claims of Lanham Act violations, negligence, and tortious interference with advantageous relations, as well as additional defendants. These counts and defendants have all been dismissed, docket no. 61, leaving only the contract claim against Buhimschi and the defamation claims against Buhimschi and Yale.

doing other science – "[a]nd if I were to include weekends and nights, probably that would exceed that number." *Id.*

Between 2001 and 2003, defendant Dr. Irina Buhimschi was an assistant professor in Wayne State's school of medicine. She took that position after Romero recruited her to collaborate with the PRB.[2] Buhimschi's husband also became involved in medical research at Wayne State. Some time after her arrival at Wayne State, Buhimschi began formally working for the PRB under a contract created pursuant to the Intergovernmental Personnel Act of 1970. Under this arrangement, Buhimschi split her time evenly between Wayne State and the PRB, but was not added to the PRB's payroll; instead Wayne State paid Buhimschi's salary and the PRB compensated Wayne State for her services. Romero acknowledges that his collaboration with Buhimschi was part of his job responsibilities. Romero dep., docket no. 95, ex. A, p. 21.

It was out of this relationship between Buhimschi and the PRB that the disputed research arose. This research used an approach known as "proteomics," in which researchers study the entire assortment of proteins present in a tissue or body fluid, in hopes of identifying specific proteins or sets of proteins that only appear along with a given kind of medical condition. If such a set of proteins is discovered, those proteins can be regarded as "biomarkers" of the condition. In the research in question, Buhimschi was attempting to discover proteomic biomarkers of inflammation or infection in the amniotic fluid of pregnant women, conditions that often lead to preterm delivery.[3] To do so,

---

[2] When Buhimschi arrived at Wayne State it had not yet won the long-term contract to house the PRB. Romero indicated to Buhimschi that if the PRB awarded the contract to some other institution, he would be interested in having her move along with the PRB.

[3] More specifically, the research was an attempt to discover a proteomic profile that would indicate whether a woman experiencing preterm labor also had inflamed or infected amniotic fluid, which would be a sign that the preterm labor would likely lead to a premature

Buhimschi and her collaborators used a form of mass spectrometry known as SELDI[4] to identify the proteomic profiles of various samples of amniotic fluid, some of which were inflamed or infected and others of which were uninflamed and uninfected "control" samples. The initial phase of their study revealed a set of four proteins that, in combination, were always present in inflamed or infected amniotic fluid, and never in the control samples. In the second phase of the study Buhimschi and the other researchers tested this conclusion by blinding themselves to whether the fluid samples they were studying were inflamed or infected, and attempting to diagnose inflammation or infection based solely on the presence of the protein biomarkers they had previously identified. The test was highly successful, and so Buhimschi began preparing a manuscript for publication.      Although Buhimschi denies it, Romero claims that he was involved in this research in several important ways. Viewed in the light most favorable to Romero, the evidence supports a finding that he contributed to the research as follows. First, several years before Buhimschi's study was conceived of, Romero oversaw the collection of a bank of more than a thousand samples of amniotic fluid; in this capacity he formulated the collection protocols and personally performed many of the amniocenteses by which the samples were obtained. Romero dep., docket no. 95, ex. A, at pp. 233-34. It was from this bank that all or almost all of the samples used in Buhimschi's study were drawn. *Id.*

Second, after Buhimschi proposed the study, it was Romero who determined the "gold standards" against which the proteomic diagnostic technique would be tested; that is, he developed the criteria by which the samples of amniotic fluid would be initially categorized as infected/inflamed or not. The proteomic diagnosis was regarded as an accurate one if

---

delivery of the baby.

    [4] Surface Enhanced Laser Desorption Ionization.

4

it "agreed" with the diagnosis indicated by the gold standard.  Romero testified that based

on his previous experience, he suggested the gold standard eventually used by Buhimschi

– a white blood cell count of 100 or more.  *Id.* at p. 70; *see also* docket no. 92, ex. 13, p.

5.  Docket no. 92, ex. 13, p. 5.  With the help of another PRB doctor, Romero formulated

this and other specific criteria by which he and the other doctor selected the 24 samples

that were used in the blinded phase, and categorized them as "inflamed/infected" or

"control."[5]   Docket no. 93, ex. 24; docket no. 92, ex. 13, p. 5; Romero dep., docket no. 95,

ex. A, at pp. 67-68, 236.

Third, the second and blinded phase of the study  – which substantially increased its

scientific value – was Romero's idea.  Romero dep., docket no. 95, ex. A, at p. 236.

Finally, Romero provided significant assistance to Buhimschi in preparing the manuscript.

Romero testified that he and Buhimschi "went line by line in the manuscript many times."

Romero dep., docket no. 95, ex. A, at p. 236.  Copies of e-mails between Buhimschi and

Romero's secretary were adduced in evidence, showing that Romero reviewed a

preliminary manuscript with Buhimschi in late May of 2002, and offered "feedback and

suggestions."  Docket no. 93, ex. 26.  Early in July of that year Romero sent Buhimschi "[a]

---

[5]  The clinical characteristics of the pathologic cases, as selected by Romero, were:

> 1) an amniocentesis because of preterm labor with intact membranes (no PROMs)
> 2) intra-amniotic inflammation (over 100 WBC)
> 3) patients with inflammation delivered shortly after the amniocentesis-preterm neonates
> 4) all patients had histologic chorioamnionitis
> 5) 50% of patients with inflammatnion had positive amniotic fluid cultures.
>
> Control cases were 1) patients who delivered at term were admitted with preterm labor and intact membranes before 33 weeks; [2)] had no elevated WBC in amniotic fluid; 3) had negative amniotic fluid culture and 4) delivered an AGA infant weeks after . . . the amniocentesis (> 37 weeks).

Docket no. 93, ex. 24.

short note to tell you that I have gone over the manuscript.  I would like to propose some changes." *Id.* Although the nature of those changes is unclear, the e-mail records indicate that Romero set aside 10 hours of working time later that month of that year for further manuscript review with Buhimschi.  *Id.*  In August, Romero emailed a few more detailed suggestions to Buhimschi,[6] and promised to read the manuscript again and offer more feedback.  *Id.*  In October, Romero emailed Buhimschi his opinion "that the manuscript has been improved over time and this will work to our benefit."  *Id.*

After the research was completed, however, a dispute erupted between Romero and Buhimschi over whether Romero's involvement qualified him to be credited as an author in the anticipated publication of the results.  The evidence adduced in this case includes voluminous records of the details of this dispute, and of the parties' disagreements as to these details, but these need not be recounted at length here.  Instead, it is sufficient to note the following undisputed facts.

In November of 2002, Buhimschi, as corresponding author, initially submitted the manuscript to *The Lancet*, a British medical journal.  This manuscript, *see* docket no. 90, ex. 3, listed Romero and other PRB doctors as authors.  *The Lancet* responded favorably, but asked for several revisions.  Docket no. 92, ex. 17.  In the meantime, however, the relationship between Buhimschi and Romero had deteriorated, and she revised the manuscript without his assistance, removed Romero's name from authorship without his knowledge, and re-submitted the text to *The Lancet*.  *See* docket no. 91, exs. 1 & 2.  When Romero learned of this, he contacted *The Lancet*, which had been under the impression that he had agreed to the removal of his name, and which subsequently informed

---

[6]  Specifically, Romero suggested that Buhimschi "change figure 1 by replacing 'intraamniotic infection' and 'intraamniotic inflammation' to 'yes' and 'no.'  I think it may be a good idea to put the western blot in figure 4 as you have it in figure 5."

Buhimschi that it would not publish the work until the authorship dispute was resolved. Buhimschi withdrew the manuscript, and some months later submitted a revised version to the *British Journal of Obstetrics and Gynaecology* ("the *BJOG*"), again without Romero's knowledge and without listing him as an author. The *BJOG* eventually published the article in February 2005. Docket no. 91, ex. 9. When Romero learned of this he requested that it add his name to authorship, but the *BJOG* agreed only to print a statement of disputed authorship. Docket no. 94, ex. 37.

II.  Procedural Posture

It is the February 2005 *BJOG* publication that is the basis of Romero's contract claim in the instant suit. He asserts that by publishing the results of the research without attributing him as an author, Buhimschi breached a contract between herself and Romero. Although there is no written contract between the parties, and Romero apparently does not contend that there was ever an explicit oral agreement to that effect, he asserts that his and Buhimschi's conduct is obvious evidence of an implied-in-fact contract between them.

Romero and Buhimschi have both moved for summary judgment on this contract claim; both motions are currently before the Court. Buhimschi bases her motion on a number of different grounds, including preemption of an implied contract by an express one, the void-for-vagueness doctrine, the Statute of Frauds, lack of legally-cognizable damages, and lack of consideration.[7]  Because the Court concludes that there was no

---

[7] Buhimschi also briefly argues that this Court has no jurisdiction over Romero's contract claim. Although there is complete diversity of citizenship between the parties – Romero is a citizen of Michigan, and Buhimschi (after her move) and Yale are citizens of Connecticut – Buhimschi notes that Romero is not seeking money damages on his contract claim, and instead only asks that Buhimschi be required to correct the authorship credit. This, she argues, fails to satisfy the jurisdictional amount-in-controversy requirement of 28 U.S.C. § 1331. It appears, however, that the damages Romero is seeking on his other remaining claim (for defamation) could exceed $75,000. Because "[i]t is well established that claims can be aggregated to satisfy the jurisdictional amount requirement," *Klepp v. First Am.*

consideration to support any contract between the parties, it will not consider the other grounds asserted by Buhimschi, nor will it consider Romero's motion.

## II.  Analysis

### A.  Summary Judgment – The Legal Standard

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as to a matter of law." Fed. R. Civ. P. 56(c). Summary judgment is appropriate if the moving party demonstrates that there is no genuine issue of material fact regarding the existence of an essential element of the nonmoving party's case on which the nonmoving party would bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Martin v. Ohio Turnpike Comm'n*, 968 F.2d 606, 608 (6th Cir.1992).

In considering a motion for summary judgment, the Court must view the facts and draw all reasonable inferences in a light most favorable to the nonmoving party. *60 Ivy St. Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir.1987). The Court is not required or permitted, however, to judge the evidence or make findings of fact. *Id.* at 1435-36. The moving party has the burden of showing conclusively that no genuine issue of material fact exists. *Id.* at 1435.

A fact is "material" for purposes of summary judgment if proof of that fact would have the effect of establishing or refuting an essential element of the cause of action or a defense advanced by the parties. *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir.1984).

---

*Bank*, 916 F. 2d 337, 341 (6th Cir. 1990), the Court has jurisdiction over the contract claim as well.

A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Accordingly, when a reasonable jury could not find that the nonmoving party is entitled to a verdict, there is no genuine issue for trial and summary judgment is appropriate. *Id.*; *Feliciano v. City of Cleveland*, 988 F.2d 649, 654 (6th Cir.1993).

Once the moving party carries the initial burden of demonstrating that there are no genuine issues of material fact in dispute, the burden shifts to the nonmoving party to present specific facts to prove that there is a genuine issue for trial. *Anderson*, 477 U.S. at 256. To create a genuine issue of material fact, the nonmoving party must present more than just some evidence of a disputed issue. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). As the United States Supreme Court has stated, "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the [nonmoving party's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted); *see Celotex*, 477 U.S. at 322-23; *Matsushita*, 475 U.S. at 586-87.

Consequently, the nonmoving party must do more than raise some doubt as to the existence of a fact; the nonmoving party must produce evidence that would be sufficient to require submission of the issue to the jury.  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252; *see Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir.1995).

B.  Consideration

The parties do not dispute that the case is governed by Michigan law.  In Michigan as in most every state, legal consideration is a required element of all contracts, both express and implied-in-fact.  *Mallory v. City of Detroit*, 181 Mich. App. 121, 127 (1989). Under the "preexisting duty rule," however, "it is well settled that doing what one is legally bound to do is not consideration for a new promise."  *Yerkovich v. AAA*, 461 Mich. 732, 740-41 (2000).  Thus, once a person has assumed a contractual duty to perform a certain act, his or her subsequent promise to do the same act – or actual performance of the act – cannot be consideration for a second contract.  *Id.*

Here, Romero asserts that he had a contract with Buhimschi, whereby he was to collaborate with her in scientific research and she was to include him as an author in any publication of that research.  It does appear that in Michigan, the authorship of a research article can be the subject of a contract.  *See generally Eadara v. Henry Ford Health Sys.*, Nos. 238137 & 238979, 2004 WL 243402 (Mich. App. Feb. 10, 2004).  As noted above, there is evidence in this case to support a finding that Romero was indeed closely involved in designing the study, selecting the biological samples for it, and revising the manuscript.[8] Nevertheless, Buhimschi contends that all these functions fall squarely within Romero's own description of his job duties at the PRB.  Thus, she claims that because Romero had a preexisting legal duty (to the PRB) to engage in these activities, his agreement to do so in with her could not form the basis of a contract between them.

---

[8] He also was directly involved in formulating the protocols by which the samples were collected, and actually collected many of the samples himself.  But this could not have been consideration for any contract with Buhimschi, because it occurred years before their collaboration, and there is no evidence in the record that Romero and Buhimschi even knew each other at that time.

Romero does not dispute that his entire collaboration with Buhimschi was within the scope of his PRB employment. The Court agrees that on this record, no reasonable jury could come to any other conclusion. But Romero objects that, while his job duties did include scientific research of the type he collaborated in with Buhimschi, he was under no preexisting duty to undertake any *particular* project or collaboration. Thus, he claims, his choice to work with Buhimschi on the proteomics project, instead of working on a different project or with someone else, should qualify as consideration for the contract.

This argument has significant appeal – there certainly is nothing in the record to indicate that the PRB expected Romero to involve himself in any particular project. Nonetheless, the Court ultimately finds it lacking in merit. Although Romero obviously enjoyed a great deal of discretion in determining which projects to work on, it must certainly have been the PRB's understanding that he would exercise this discretion solely in the PRB's interest and not for personal gain. Thus, having determined that collaboration with Buhimschi and on the proteomics research was a worthwhile project – as he clearly had, given his personal recruitment of Buhimschi and his obvious interest in the proteomics project – Romero had an obligation to the PRB to pursue it.

All this is to say that a government employee who has discretion in his work is not, as a matter of contract law, free to make side bargains with third parties that will control the exercise of that discretion. For instance, if a government scientist demanded cash payments as a condition of agreeing to a scientifically worthy collaboration, the preexisting duty rule would bar his suing to collect on such a bargain.[9] This conclusion is fully supported by the Restatement (Second) of Contracts, § 73 cmt. b., which states that "[a]

---

[9] Such a recovery would also likely be barred by statute, but that is not the point here.

bargain by a public official to obtain private advantage for performing his duty is . . . unenforceable as against public policy.   And . . . performance of the duty is not consideration for a promise."[10]  This proposition does not mean that government scientists are unable to demand authorship credit in return for their scientific collaboration with outside researchers.  It simply means that the demand should not be couched in terms of contractual obligations.[11]

Romero further states that, if he had known that Buhimschi would refuse to acknowledge him as an author, he would not have agreed to collaborate with her.  Thus, he suggests that it would be nonsensical and inequitable to construe his obligations to the PRB as requiring him to collaborate with Buhimschi even if she refused in advance to include him as an author.  While the Court largely agrees with this argument, it does not find it to be relevant to the case.  More specifically, the Court is inclined to agree that if before their collaboration began Buhimschi had preemptively declared her unwillingness to include Romero as an author in the published results, his duties to the PRB would not

---

[10]  Buhimschi also suggests that her position is reinforced by  5 C.F.R. 2635.807(a), which provides that a government employee "shall not receive compensation from any source other than the Government for teaching, speaking or writing that relates to the employee's official duties," and defines "compensation" as "any form of consideration, remuneration or income . . . given for or in connection with the employee's teaching, speaking or writing activities," *id.* § 2635.807(a)(2)(ii).  But the "consideration" that Romero claims he received here – a promise of authorship of a scholarly article – cannot be within the scope of this regulation.  Government scientists routinely receive authorship credit for their collaborations, without anyone suggesting they are breaking the law.  Yet if, as Buhimschi suggests, authorship credit were regarded as "consideration . . . given for or in connection with" the *writing* activity, this would indeed be contrary to the regulations.

[11]  Although the Court's findings would be the same in any event, this order's conclusions also offer some protection to the scientific community against inappropriate intervention by the courts.  It would be an undesirable state of affairs if the courts, rather than scientists (who are much better positioned to do it), were required to determine whether any particular scientist's work on a project was worthy of authorship credit.

12

have required him to do the work with her-- because it would not in the PRB's interest for its scientists (and the PRB itself) to be denied the credit they deserve for their work.  But even by Romero's account, that is not what happened here.  Although Romero and Buhimschi apparently did not explicitly discuss authorship until well into the project, on Romero's evidence it appears that they both assumed from the outset that he would be an author if the work resulted in publication.  Under circumstances such as these, the Court concludes that Romero's duties to the PRB required him to conduct the collaboration on determining it to be worthwhile, with the presumption that Buhimschi would comply with scientific ethics in regard to authorship attribution.

C.  Conclusion

For these reasons, Romero has failed to present evidence that would permit a reasonable jury to find that he undertook any contractual duty to Buhimschi that he was not already bound to by his preexisting contractual responsibilities to the PRB.  As a result, there are no facts in the record sufficient to establish a contract between himself and Buhimschi, and summary judgment will therefore be granted in favor of Buhimschi on Romero's contract claim.

**LIBEL CLAIM**

Before filing this lawsuit, Romero recounted his version of the facts of the case in various fora, as he attempted to prevent what he perceived as further misconduct by Buhimschi.  Buhimschi responded with her account of how the collaboration and dispute between herself and Romero progressed, which as one might suspect is quite different from Romero's.  Count V of Romero's amended complaint asserts that Buhimschi's version of the events, as published by her and republished by others, is libelous as against

13

Romero.[12]  As all claims arising prior to January 28th, 2005, have previously been dismissed pursuant to the applicable statute of limitations, docket no. 61, the Court will here discuss only publications that allegedly occurred after that date.

A.  Facts

1.  Circumstances of the publications

Romero presents three separate publications that he claims were libelous.  Two of them are related, in different ways, to a complaint of scientific misconduct that Romero filed against Buhimschi at Wayne State University, after she submitted the *Lancet* manuscript for publication without listing Romero as an author.  Buhimschi participated in the ensuing scientific-misconduct investigation in only a limited fashion.  She gave several reasons for this, the only one of which is relevant here is that while the investigation was going on, she and her husband were in the process of leaving Wayne State and taking up new posts at Yale University's School of Medicine.  After the Wayne State investigative committee concluded that she had indeed engaged in misconduct, however, Buhimschi (writing now from Yale) submitted a lengthy appeal letter setting out her side of the story in full.  Romero claims that many of the statements contained in this appeal letter were libelous.  Because this letter was submitted on January 20th, 2005 – more than one year before Romero filed the instant suit -- his claim based on the initial publication to Wayne State is barred by the relevant statute of limitations.  A few weeks after Buhimschi initially sent the appeal letter, however, the *BJOG* published her research, again without attributing Romero.  When

---

[12]  Romero has moved for leave to amend his complaint to add additional counts of defamation against Buhimschi and other new defendants associated with Yale.  Docket no. 150.  The reasoning below for the Court's grant of summary judgment on Romero's existing claim, would also apply to the proposed new claims.  Because the Court thus finds that the underlying facts and circumstances relied on by Romero would not be a proper subject of relief, his motion to amend will be denied as futile.  *See Foman v. Davis*, 371 U.S. 178, 182 (1962).

Romero learned of this, he notified Wayne State officials, who promptly communicated with the editors and stated that Buhimschi had improperly denied Romero a share of the authorship. The editors told Buhimschi of Romero's claim, and she responded on March 14th, 2005, by forwarding to the *BJOG* a copy of her appeal letter. This republication is within the statute of limitations, and is the first of the three publications that Romero complains of here.

The defamatory statements in the appeal document can be roughly grouped into three categories. First, Buhimschi claims that Romero improperly took credit for her ideas and research, and then published them and applied for a patent under his own name, in competition with her. *E.g.,* Buhimschi appeal letter, docket no. 119, ex. 2, at §§ 1.3 (Romero proposed Buhimschi's research ideas to another researcher as his own); 1.5 (based on progress reports from Buhimschi, Romero secretly undertook research parallel to hers "so that he could take credit for my work"); 1.7 (Romero passed off Buhimschi's work as his own to the NICHD); 1.8 (Romero delayed submission of Buhimschi's manuscript, and halted further work by Buhimschi because she would not make him the principal investigator, for fear that it might "contradict[] his lifetime theory"); 1.20, 2.8 (Romero plagiarized Buhimschi's work, then "rushed" it to publication without peer review in a journal on which he was on the editorial board, in order to publish ahead of Buhimschi); 4.16 ("Dr. Romero filed a competitive patent application which includes figures, text and data analysis from my work . . . .).

Second, Buhimschi stated that Romero frequently pressured her to confer authorship recognition in the article on persons who had made little or no contribution to the research. *Id.* at § 1, *passim*; *see also id.* §§ 1.9 (Romero engaged in "inappropriate physical contact" with her in an attempt to persuade her to include as an author a researcher who had made

no contribution, and to falsely admit that she had learned proteomics from that researcher); 5.6.1, 5.6.5 (Romero pressured her to include other members of the PRB as authors even though their research contributions were insufficient).

Finally, Buhimschi claimed that in response to her unwillingness to acquiesce to his inappropriate demands, Romero engaged in a general campaign of harassment against her, often by playing up the PRB's contractual leverage with Wayne State to get Wayne State employees to do Romero's bidding. *E.g., id.* §§ 1.9 (Romero told Buhimschi and her husband "that we had to give him all our research projects in exchange for his institutional 'protection,'" and that if they refused "he would take this as a personal offense rising to the level of 'his career against my career'"); 1.13, 1.15 (at Romero's request, Wayne State officials blocked Buhimschi's husband's access to biological samples and engaged in other harassment to impede her research). According to Buhimschi, some of this harassment was also designed to secure for Romero valuable patent information that belonged to her. *Id.* § 3.1 ("Dr. Romero filed a bogus complaint of misconduct," and at his bidding WSU officials locked Buhimschi out of her office and cut her email access, in order to secure and photocopy information related to their competing patent applications).

Buhimschi's appeal was eventually denied, and Wayne State's finding that she had committed scientific misconduct thus became final.[13]  The investigative committee had recommended that Buhimschi's future publication submissions be monitored to ensure that she was crediting authorship properly. Since Buhimschi was now at Yale, Wayne State forwarded the findings of its investigative committee to Yale, and requested Yale's help in

---

[13]  The accuracy of this finding is not at issue in this case. Therefore, the Court notes, but expresses no opinion on, Buhimschi's allegations that there were numerous deficiencies in the Wayne State proceedings that rendered them fundamentally unfair. In particular, she claimed that Romero's personal contacts and institutional influence at Wayne State rendered the proceedings rife with conflicts of interest.

16

implementing the committee's recommendation.  In response, Yale convened an *ad hoc* committee to consider whether to accept the Wayne State committee's findings, and whether Yale should take any action with respect to that committee's recommendations.

The second publication of which Romero complains here is a letter sent on May 4th, 2005, from Lawrence Cohen, the special adviser to the Dean of Yale Medical School, to each member of the *ad hoc* committee.  Docket no. 119, ex. 4A.  This letter summarized the dispute and explained what the committee was to do.  Thus, it included a summary of Buhimschi's contentions with respect to Romero's pressuring her to bestow "gift authorships" and attempts to steal Buhimschi's research.  *Id.*

Finally, before she ever submitted the disputed manuscript to the *BJOG*, Buhimschi had become concerned that its publication might be delayed indefinitely by the dispute with Romero.  As a result, she contacted a former mentor of hers, Dr. Carl Weiner, and requested that he explain her perspective on the manuscript's provenance to the *BJOG* editorial staff.  Weiner agreed, and in a series of emails to  one of the *BJOG*'s editors he stated, among other things, that Romero had rushed Buhimschi's research to publication under his own name even though he had not been involved in it, and that he was engaged in a "ploy over authorship" in an attempt "to justify the claims to the patent."  Docket no. 119, ex. 3.  Weiner concluded that "[i]t seems clear to me that Roberto is trying to leverage the position of the NIH to claim work that is definitively not his.  My guess is that he mislead [sic] his superiors about his [sic] origins and is now in a position he cannot admit."  *Id.* Although Weiner sent the last of these emails in October 2003, well before the applicable limitations period in this case, Buhimschi republished them via facsimile transmission to Susan Carney, a deputy general counsel at Yale, on May 4th, 2005 (the same date that

Lockwood mailed his letters to the members of the *ad hoc* committee).  This fax was within the limitations period, and is the third publication of which Romero complains.


B.  Procedural Posture

Romero claims that each of these publications amounts to defamation *per se*, entitling him to judgment against Buhimschi and also against Yale on a theory of *respondeat superior*.  Buhimschi and Yale have moved for summary judgment, offering a number of defenses to liability.   These include Michigan's common-law privilege in favor of communications made during quasi-judicial proceedings, its statutory privilege in favor of accurate reports of public proceedings, the First Amendment's protections for statements about public figures and public officials, and Michigan's privilege in favor of communications between persons having an interest in their subject matter.  Yale also separately argues that on these facts, it cannot be liable in *respondeat superior* for any tortious conduct Buhimschi may have engaged in.   The Court will not consider these legal theories, however, because it finds all the communications in question to be protected by yet another privilege advanced by Buhimschi and Yale: that of consent, as implied by Romero's conduct.

C.  Analysis

"A communication regarding a person is absolutely privileged if it is consented to." *Merritt v. Detroit Memorial Hospital*, 81 Mich.App. 279, 265 N.W.2d 124 (1978).   In Michigan, a plaintiff need not have approved or even been aware of the exact contents of a defamatory statement in order to consent to its publication.  Indeed, in previous cases the Michigan courts have found that a plaintiff's invocation of an employer's administrative or

18

disciplinary proceedings was effective as consent to the publication of the other side of the story.  In *Schechet v. Kesten*, 3 Mich. App. 126 (1966), an osteopath working at a hospital was placed under supervision by the chairman of the department of surgery, who cited unnamed concerns about the doctor's judgment *Id.* at 129.  The doctor responded by invoking his contractual rights to  "the specific list of charges" on which the decision was based, and to raise the issue before the hospital's executive committee.  *Id.* at 130.  He requested the list of charges from the executive committee as well.  *Id.* at 131.  In response to this, the chairman sent the committee a letter listing a long series of alleged deficiencies in the plaintiff's performance.  In conclusion, the letter stated that "Dr. Schechet is so obsessed with insecurity, hate, fear and frustration that has so warped his judgment, that his activities have become dangerous to the Staff, Hospital and Osteopathic Profession." *Id.* at 131-32.  The court held that by demanding the list of charges, the doctor had consented to its publication, which was therefore privileged against liability for defamation. *Id.* at 133.

Similarly, in *Hollowell v. Career Decisions, Inc.*, 100 Mich. App. 561 (1980), the plaintiff alleged that one of the defendants "slandered plaintiff in a board of directors meeting," *id.* at 574, by accusing her "of having lied about her employment and business background and experience and accused plaintiff of incompetence in her profession," *id.* at 574 n.3.  The court noted, however, that "plaintiff acknowledged in her deposition that she requested the board of directors to discuss defendant Brown's dissatisfaction with her performance."  *Id.* at 574.  Thus, the court concluded, "[p]laintiff requested the very conversation which she alleges slandered her. . . .  Under the circumstances, we find plaintiff consented to the slander of which she complains."  *Id.* at 575.

An explicit solicitation of the defamatory statements is not required before a court will find plaintiff to have consented to them.  Instead, Michigan courts have found plaintiffs to have consented to defamatory statements simply by making accusations of impropriety or wrongdoing to which the defendant responded with the complained-of publication.  For instance, in *Medical Planning Consulting, Inc. v. St. Mary's Medical Ctr.*, No. 214018, 2000 WL 33418859 (Mich. App. June 13, 2000), the plaintiff's attorney sent a letter to the defendant, threatening to file suit over the defendant hospital's termination of the parties' previous business dealings.  The letter further stated that the plaintiff had

> agreed with my recommendation that I should offer the hospital one last opportunity . . . to satisfactorily resolve this situation [before litigating]. It is my understanding that Medical Planning Consulting, Inc., has provided valuable services to the hospital over the last ten years without complaint by the hospital, and to the hospital's great financial benefit, and it is surprising to me that the hospital would terminate such a longstanding relationship without so much as any written notice to a company that they had done business with successfully for so many years, let along [sic] the one year written notice required by the "Memorandum Agreement."

*Id.* at *5 n.4 (alteration in original).  In response, one of the defendants wrote to the attorney, stating that the plaintiff's sole employee and shareholder had "retrospectively altered patient billing records in an attempt to gain financial benefit" for herself.  *Id.* at *5. The plaintiff sued, claiming that these statements were defamatory.  But the court held that through her attorney's initial letter, the plaintiff had "requested a response" as to why the business relationship had been terminated, and thus "invited the alleged defamatory statements," rendering them absolutely privileged.  *Id.*

In this case, the record permits only one conclusion: like the plaintiffs in *Schechet*, *Hollowell*, and *Medical Planning*, Romero invited the statements by Buhimschi that he now alleges defamed him.  Similarly to *Schechet* and *Hollowell,* it was Romero who invoked the Wayne State disciplinary proceedings to which Buhimschi's original appeal letter was a

20

response.    It was Romero who prompted Wayne State to notify the *BJOG* of the investigatory committee's findings, to which Buhimschi responded – analogously to *Medical Planning* – by forwarding her appeal document to the *BJOG*.    When the committee's findings were forwarded to Yale Medical School – as Romero surely had intended, given his stated desire to protect himself from Buhimschi's improper publication of any more of the data he says they generated together – Yale responded by forming a committee of its own, and having the special advisor to its Dean summarize Buhimschi's side of the story to the committee.    Buhimschi herself responded, on the same day, by forwarding Weiner's articulation of her side of the story to Yale's deputy general counsel.

Romero argues that Wayne State submitted its report to Yale and the BJOG on its own initiative, and that there was no privity between it and Romero.    Thus, he says, he cannot be held to have invited Buhimschi's and Lockwood's responses to the BJOG and Yale.    The Court finds this to be an impossibly strained reading of the facts.    Romero's scientific misconduct complaint was much more than a request for purely declaratory relief that would remain internal to Wayne State.    Rather, it was an attempt to protect Romero's scientific reputation and his right to recognition for research, the results of which were intended to follow Buhimschi wherever she went.    Indeed, Romero himself identified to Wayne State a number of persons outside the university who he wished to have notified of the results of the investigation.    Romero dep., docket no.95, ex A, at p. 166.    The report was actually sent to scientists and other persons in the medical field across the entire country, including five individuals at Yale.[14]    Docket no. 95, ex. A-30.    Given this evidence,

---

[14] This transmission occurred in October 2004, before the *BJOG* article was published or known to Romero.    As a result, no representative of the *BJOG* was on the initial list of persons to be notified of the report.    Nonetheless, it is clear that the notification that eventually occurred was motivated by the same purposes, protecting Romero's reputation and research, as the original notices.

no reasonable jury could find that Romero did not invite not only Buhimschi's attempts to clear her name before the Wayne State committee, but also her presentation of her side of the story to Yale and to the *BJOG.* There is no evidence to contradict the record support for any of these conclusions, and accordingly the Court concludes that no reasonable jury could find otherwise. Under these circumstances, each of these responses was invited – and thus consented to – by Romero's various complaints about Buhimschi's conduct. As a result, each of them is privileged, and none of them can be the basis for libel liability for either Buhimschi or Yale.

## CONCLUSION AND ORDER

Romero claims that he had a contract with Buhimschi, whereby he would collaborate with her on proteomics research and she would include him as an author in any resultant publication. Because, however, the evidence dictates the conclusion that Romero's entire collaboration with Buhimschi was simply a part of his preexisting employment duties, there could never have been a legally enforceable contract between the two doctors.

Romero also claims that various publications by Buhimschi and Yale libelled him. The record evidence, however, compels the conclusion that all these publications respond to complaints and reports of Buhimschi's misconduct made by Romero himself. As a result, under Michigan law, Romero consented to these publications through his conduct, and they are therefore privileged and cannot form the basis of a libel claim.

As the record shows, the scientific and academic communities have invested considerable resources in establishing their own institutions and procedures for dealing with claims of this type. Although these doubtless have their own flaws, in many cases they will likely prove superior to the judicial system in resolving this sort of dispute. As the facts of

22

this case have failed to properly present the scientific controversy at its core for judicial resolution, it is the Court's responsibility to enter summary judgment for the defendants.

**WHEREFORE**, it is hereby **ORDERED** that:

  the defendants Buhimschi's and Yale's motions for summary judgment (docket nos. 95 & 97) are **GRANTED**, and Romero's motion for partial summary judgment (docket no. 90) is **DENIED**;

Romero's motion for leave to amend his complaint, docket no. 150, is **DENIED** as futile, for the reasons articulated in this opinion; and

Romero's motion *in limine*, docket no. 145 is **DENIED AS MOOT**.

Judgment as to all remaining claims will be entered in favor of defendants, and the case will be closed.

    **SO ORDERED**.

        s/Stephen J. Murphy, III
        STEPHEN J. MURPHY, III
        United States District Judge

Dated:  January 14, 2009

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on January 14, 2009, by electronic and/or ordinary mail.

        s/Alissa Greer
        Case Manager