UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROBERTO ROMERO,

       Plaintiff,

v.

IRINA BUHIMSCHI, YALE UNIVERSITY,
CARL WEINER, ROYAL COLLEGE OF
OBSTETRICIANS AND
GYNAECOLOGISTS, and JOHN DOES A
through G,

       Defendants.

_____/

Case No. 2:06-cv-10859

HONORABLE STEPHEN J. MURPHY, III

**OPINION AND ORDER DENYING PLAINTIFF'S MOTION
FOR RECONSIDERATION** (docket no. 154) **OF THE COURT'S
ENTRY OF SUMMARY JUDGMENT IN FAVOR OF DEFENDANTS**

This case centered around a disagreement between two research physicians, plaintiff Roberto Romero and defendant Irina Buhimschi, as to whether Romero was entitled to be credited as an author in a research article that Buhimschi submitted for publication without giving him such credit. Buhimschi was a professor of Obstetrics and Gynecology at Wayne State University's medical school; Romero is chief of the Perinatology Research Branch ("PRB") of the National Institute of Child Health and Human Development. The PRB is housed at Wayne State. Buhimschi has since left Wayne State to take a position at Yale University, and Romero named Yale as an additional defendant in this lawsuit.[1]

On January 24th, 2009, the Court entered summary judgment as to all the surviving claims in Romero's complaint. One of these claims was for breach of an implied contract,

_____

[1] As the caption indicates, Romero named other defendants as well, but the claims against those defendants have been disposed of and are not subjects of this motion.

by which Romero allegedly agreed to collaborate with Buhimschi, and she in return promised to include him as an author if he merited it.  The Court concluded that Romero had a preexisting duty to his employer to identify and pursue the most worthy scientific collaborations available, and that any agreement by Romero to collaborate with Buhimschi therefore could not constitute consideration of the type necessary to support a contract. The other remaining count was for libel.  Buhimschi had submitted documents to Yale and to the medical journal in which she sought publication, alleging that Romero had engaged in various types of misconduct.  Romero asserted that this amounted to libel, but the Court granted summary judgment on this count as well, holding that Romero had first accused Buhimschi of wrongdoing and thus had implicitly consented to her response.

In the instant motion, Romero requests that the Court reconsider its grant of summary judgment on his defamation claim.  For the reasons that follow, the Court will deny the motion.

## FACTS

Most of the relevant facts are set forth in the Court's Opinion and Order of January 24th, which is incorporated herein by reference.  As the Court noted in that Opinion and Order, after the statute of limitations is taken into account, three publications remain that could potentially result in libel liability for Buhimschi.   To explain its denial of reconsideration, the Court will catalog their contents in more detail here.

I.   The Appeal Document

The first publication is Buhimschi's letter of appeal to the Dean of Wayne State University's Graduate School.  *See* docket no. 103-8.  The circumstances of the original submission of this document, and of Buhimschi's re-publication of it to the *British Journal of Obstetrics and Gynaecology*, are detailed in the Court's Opinion and Order of January

2

14th.  Liability for Buhimschi's original submission of the letter to Wayne State is barred by the statute of limitations, but her submission of the same document to the *BJOG*, in response to Wayne State's communication to it of the results of Wayne State's investigation, is not.

The letter is indeed replete with accusations of serious wrongdoing by Romero. These come under four main headings: (1) that Romero "stole" Buhimschi's work and used it as the basis for his own publication and patent application, (2) that Romero pressured her to attribute authorship credit to those who did not deserve it, (3) that Romero improperly used his institutional position to pressure Buhimschi to commit research misconduct, and (4) that Romero was personally abusive and unpleasant.

First are the accusations that Romero improperly tried to take credit for Buhimschi's research.  The Appeal Document states that Romero "duplicated and published part of the [proteomics] data" that Buhimschi had generated "without *peer-review* in a journal where he serves in the Editorial board, without including or acknowledging me."  Appeal doc., p. 9.[2]  Buhimschi states that less than 48 hours after she first told Romero of her plan to look for proteomic biomarkers in amniotic fluid -- which was the subject of the disputed article -- Romero secretly submitted a proposal including aspects of this work to another doctor. *Id.* ¶ 1.3.  While Buhimschi's research was being conducted and while she was drafting her manuscript, she provided Romero with periodic updates on the work, and maintains that he was secretly "conducting parallel experiments" based on this information "for the purpose of competing against me so that he could take credit for my work."  *Id.* ¶ 1.5. These parallel studies, according to Buhimschi, were "aimed to quantify some of the

---

[2]  Most of Buhimschi's Appeal Document is divided into numbered paragraphs.  The portions that are not will be cited to by page number.

biomarkers I discovered." *Id.* ¶ 1.9.  Romero told the other doctors he was working with to keep this research secret from Buhimschi and her husband.  *Id.*  After Buhimschi assisted Romero in preparing a proteomics presentation for the NIH leadership, she claims that he presented the work as if it had been done by him instead of her, and that he obtained funding by doing so.  *Id.* ¶ 1.7.  Eventually, Buhimschi claims that Romero "rushed to publish" his competitive research "ahead of our joint manuscript." *Id.* ¶ 1.20.  Romero's publication, according to Buhimschi, plagiarized a diagnostic scoring method from her manuscript and duplicated some of her data and "reported [it] as original research." *Id.; see also id.* ¶ 5.6.2.  Ultimately, Buhimschi claims, "Dr. Roberto Romero filed a competitive patent application which includes figures, text and data analysis from my work along with the figures and results incorporated in his duplicative manuscript already published." *Id.* ¶ 4.16; *see also id.* p. 26.

The second category of assertions in the appeal document are Buhimschi's claims that Romero tried to convince her to give authorship credit to researchers who were clearly not entitled to it. The appeal letter asserts that Romero has "a tendency . . . to attribute authorship based on his personal relationships, provision of test materials or funds and not necessarily upon actual contributions to the subject matter of the work.," and that "[this flagrantly contravenes authorship policies," *id.* p. 9; *see also id.* ¶ 5.5, as well as "practices commonly accepted in the scientific community for proposing[,] conducting or reporting research," *id.* p. 24.  Buhimschi claims that when the research was nearly complete, she gave in to pressure from Romero to draft a document stating that several doctors had made contributions to the research, even though in fact some of those doctors did not merit authorship.  *Id.* ¶¶ 5.6.1, 5.6.5.  After the manuscript was finished, Buhimschi states that Romero "insisted]" that she add as an author another doctor who "had not been involved

4

in any way on the project". *Id.* ¶ 1.6.  Romero "pressured [Buhimschi] numerous times" to that effect.  *Id.*; *see also id.* ¶1.11.  Buhimschi also stated that Romero "request[ed]" that she "modify experimental data" in some unspecified way.  *Id.* ¶ 1.6.  Other portions of the appeal letter seem to indicate that the modification Romero allegedly requested was that Buhimschi state that the research took place later than she really did, so as to make it appear as if she had learned the proteomics techniques from the doctor who Romero wanted to be an additional author (or from one of that doctor's associates).  *Id.* ¶ 1.9; *see also id.* pp. 9-10.

Third, as the dispute deepened, Buhimschi's appeal document accuses Romero of using his "administrative power," *id.* p. 10, to try to coerce her into agreeing to his demands by needlessly delaying submission of her manuscript and halting the progress of her other work,  *id.* ¶ 1.8.  Buhimschi's husband was also a doctor involved in medical research at Wayne State; she claims that at Romero's request, WS took "actions aimed to stop my husband from having access to biological samples, and implicitly progress on the prospective study I initiated and thus on my grants." *Id.* ¶¶ 1.13, 3.1.  Romero also got WS to harass Buhimschi in order to "directly impinge" her presentation of the proteomics work to the Society for Maternal-Fetal Medicine.  *Id.*  ¶ 1.15.  Buhimschi was told, she alleges, that if she would accede to Romero's improper requests her "issues" with Wayne State would "disappear."  *Id.* ¶ 4.2.  After the inquiry into Romero's allegations of scientific misconduct began, Buhimschi alleges that Wayne State officials "began 'securing' the experimental data and my laboratory books in the interest of Dr. Romero," in an attempt to procure patent data for him.  *Id.* ¶ 3.1.  Buhimschi claims that correspondence between Romero and Wayne State officials proves this allegation.  *Id.*

Finally, and more generally, Buhimschi's appeal document accuses Romero of having an "abusive professional style." *Id.* ¶ 2.5. Buhimschi states that during the course of the dispute it became "obvious" to her that "constructive dialogue was not Dr. Romero's intention." *Id.* ¶ 4.14. She states that she had "many bizarre interactions with so many different individuals at WS, all based on Dr. Romero's petty politics of power." *Id.* p. 28. Buhimschi asserts that several of the series of events just described came to a head when she discovered Romero's secret parallel experiments and confronted him about them. *Id.* ¶ 1.9. According to Buhimschi, Romero belatedly offered her a chance to be an author on his "secret" project, which she refused because his manuscript was basically complete. *Id.* As she left Romero's office after this incident, Buhimschi says that he "followed me down the corridor" and addressed her "in an abusive manner including inappropriate physical contact." *Id.* Buhimschi states that at this point Romero reiterated his demands that a non-contributing doctor be made an author on her own manuscript, that she falsely state that she had learned proteomics techniques from this non-contributing doctor, that she falsify the manuscript in regard to the dates on which the proteomics data had been generated, and that she disclaim any intellectual property value in the manuscript. *Id.* Buhimschi also claims that at a later meeting, Romero demanded that "my and husband and I . . . give him all our research projects in exchange for his institutional 'protection.'" *Id.* She also claims that the charges of misconduct against her were an attempt by Wayne State and Romero "to gain improperly in the patent process." *Id.* p. 20.

II.   Letter to Yale *Ad Hoc* Committee

The second allegedly defamatory publication took place at Yale University, in the form of a letter from Dr. Lawrence Cohen to members of an *ad hoc* committee convened by Yale to consider whether to implement the sanctions that the Wayne State committee had

6

recommended against Buhimschi.[3]  Cohen briefly summarized Dr. Romero's complaints against Buhimschi related to Romero's removal from authorship.  Cohen then noted that Buhimschi's version of the events in question includes allegations of scientific misconduct by Romero "that may not have been addressed by the WSU investigation Committee."  Cohen then summarizes those allegations:

> [Buhimschi] explains that . . . Dr. Romero required her to add himself and three others and their data into the manuscript for his own professional advantage; he pressured her to add another high ranking individual as author, one whom she alleges made no contribution at all to the manuscript; and he delayed her first-author publication in order to gain personal and professional advantage by publishing similar material first.  She argues that her professional vulnerability at WSU as a junior faculty member, and that of her husband, meant that she could not advise the Romero co-authors that their contributions (and hence their authorship) were being deleted at the suggestion of the journal, for fear of harmful retaliation.  Dr. Buhimschi and Dr. Romero are also engaged in a patent dispute concerning the subject of the manuscript . . . ."

## III.   Emails from Dr. Weiner to Dr. Thornton

The final publication not barred by the statute of limitations consists of a series of emails sent from Dr. Carl Weiner, a former mentor of Dr. Buhimschi's, to one of the *BJOG*'s editors.  Again, any liability based on the original emails is barred by the statute of limitations; Romero's claim is predicated on these documents' republication by Buhimschi, in the form of a fax to an attorney for Yale University, sent after Yale received Wayne State's request to monitor Buhimschi's publication submissions.

The email from Wiener contains many charges that are similar to those made by Buhimschi in her appeal document.  Weiner states that "[w]hile [the proteomics research was] under review by the Lancet, Roberto published the same work in his journal (Perinatal

---

[3]  Again, more specifics as to the circumstances of the sending of this letter can be found in the Opinion and Order of January 14th.

and Neonatal Medicine, the so-called Black J[ournal]) after a 1 day review and acceptance process." Docket no. 119-5, p. 4. Weiner emphasizes that, with respect to the *Lancet* article, "Roberto never saw the information until shown the finished results," *id.*, and again states that Romero's parallel publication "contained only the ELISA material that was with the original LANCET submission as confirmation of the proteomic analysis. It was then presented in the BLACK J as a 'new discovery,'" *id.* at 1.[4] Weiner also states that

> Roberto was claiming ownership of any patent rights because he provided some samples, though there is no such written agreement. The ploy over authorship, I believe, was to obtain the raw data so that he could justify the claims to the patent. Several law firms have to date concluded his claims are unfounded.

*Id* at 4. According to Weiner, "[Buhimschi] fears he is actively seeking to duplicate the data and publish the results as his own. . . . [This] would sadly allow a senior member of our field to rob a young investigator of recognition of [sic] her work." *Id.* Weiner's conclusion is that "Roberto is trying to leverage the position of the NIH to claim work that is definitively not his. My guess is that he mislead [sic] his superiors about his origins [sic] and is now in a position he cannot admit." *Id.*

## ANALYSIS

These publications are arguably defamatory. The question here, however, is whether they were privileged in some way. In granting summary judgment, the Court held that by acting as complainant in the Wayne State proceedings, Romero consented by his conduct to a response by Buhimschi. In moving for reconsideration, Romero takes issue with that conclusion, arguing that there are several limitations on the doctrine of implied consent that bar a finding of consent here. The Court has already rejected Romero's argument that he

---

[4] This statement apparently originated as a clarifying comment in a later emails, but was part of a single document that Buhimschi faxed to Yale's attorney.

did not consent to Buhimschi's publications because he did not know they would turn out to be defamatory. Thus, only Romero's other asserted limitations on the consent doctrine remain. Each will be discussed in turn.

A. Prior Publications

Romero argues that a plaintiff's consent to a defamatory publication does not bar liability if the same publication was previously made without the plaintiff's consent. In favor of this proposition, he cites only a single clause of a single sentence in a 45-year-old case from Missouri. *Hellesen v. Knaus Truck Lines*, Inc., 370 SW 2d 341, 346 (Mo. 1963). The Court finds no evidence that this doctrine is part of the law of Michigan. Nor does the Court discern any sound rationale for this rule. An unprovoked defamatory utterance is, and should be, grounds for liability, if no privilege or defense applies. But once the plaintiff has joined the fray by taking steps that invite a response from the defendant, the defendant's prior defamation should not act as a muzzle, making all further comments equally tortious. If a plaintiff wishes to avoid immunizing future defamations by consenting to them, he should limit himself to denying the allegations and avoid taking steps that clearly invite a response.

Even if this doctrine were a part of the law of Michigan, however, it presumably would mean only that a prior publication would negate consent to republication to the same person or persons that received that previous publication. It would be preposterous if a defendant's defamatory publication to person A would mean that the plaintiff could bring some sort of charge against the plaintiff in forum B, and then sue the defendant for telling his side of the story when invited to do so by the authorities in forum B. But that is precisely what Romero argues here. Buhimschi did in fact make defamatory publications against Romero before Romero assumed to role of complainant -- the email from Weiner

to the *BJOG* was dated October 10th, 2003, and he presumably was relying on information relayed to him by Buhimschi, whereas the Wayne State investigative committee did not reach its conclusions until May 20th, 2004. There would thus be some justification for a legal rule that would permit Romero to contact Weiner (and whomever else Buhimschi may have published her accusations to) and try to clear his name, without exposing himself to further defamations by Buhimschi. But it would be remarkable if these statements by Buhimschi to Weiner (and probably others), to the effect that Romero stole her research, could prevent her on pain of libel liability from later telling the same story to Yale and the *BJOG* after the Wayne State process instigated by Romero communicated his accusations to those institutions.[5] This is not the law, and the Court will not disturb its earlier holding on this basis.

    B.  Knowledge of Plaintiff's Disagreement

Romero's next contention is that a plaintiff does not consent to a publication if the defendant knows or has reason to know, at the time of publication, that the plaintiff disputes its accuracy. In support of this contention, he cites *Compuware Corp. v. Moody's Investors Servs., Inc.*, 499 F. 3d 520 (6th Cir. 2007) (applying Michigan law). In that case, Compuware hired Moody's to assign an initial rating to Compuware's creditworthiness, and then to conduct continued monitoring of Compuware's financial situation. *Id.* at 522-23. About two and a half years after issuing its initial rating, Moody's prepared a "proposed ratings report" that would have downgraded Compuware's ratings to "junk" status. *Id.* at 523. The report also explained the reasons for the downgrade. The proposed report was

---

[5] Romero seems to take the position that Buhimschi's submission of her appeal letter to the *BJOG* was in fact merely a repetition of the libels that Weiner had emailed to the *BJOG* before the Wayne State investigatory process began. In light of the Court's holding that prior publication is not a bar to implied consent, there is no need to make a determination on this question.

sent to Compuware's Chief Financial Officer for prepublication review, and the next day the CFO responded to Moody's, taking issue with some of the report's account of Compuware's finances, and generally objecting "that the ratings downgrade was unjustified given Compuware's current financial situation." *Id.* at 524. Moody's nevertheless issued the report, with the downgrade intact, a few days later. *Id.* In response, Compuware filed suit, alleging among other things that the report was defamatory. The trial court granted summary judgment for Moody's, however, holding that Compuware had not created a question of fact as to whether Moody's had published the report with actual malice, as would have been required for liability since Compuware was a public figure. *Id.* at 525. The trial court also concluded that, by conducting prepublication review of the report, Compuware had consented to the publication of all its contents except those portions that Compuware had specifically objected to. *Compuware Corp. v. Moody's Investors Servs., Inc.*, 371 F. Supp. 2d 898, 902-03 (E.D. Mich. 2005). On appeal, the Sixth Circuit affirmed the district court's conclusion as to the lack of evidence of actual malice, *Compuware*, 499 F. 3d at 526-28, but found that the district court had erred as to the question of consent. According to the Sixth Circuit, fact questions remains on the issue of Compuware's consent to the publication of most or all of the report, because the objection by Compuware's CFO "that the ratings downgrade was unjustified" was an "indicat[ion] that Compuware did not agree with substantial portions of the report and, perhaps, that it did not want it to be published." *Id.* at 526.

Romero argues that this precedent establishes that a defendant's knowledge of a plaintiff's disagreement with a publication categorically precludes the possibility of implied consent. The Court disagrees. According to the Restatement (Second) of Torts*,* "[w]hether words or other conduct are reasonably to be interpreted as expressions of consent to the

11

publication is to be determined by the reasonable inferences from the conduct in the in the light of the circumstances surrounding it."  Restatement (Second) of Torts, § 583 cmt. (c). In the Court's view, this is a correct statement of the law, with the plaintiff's disagreement with a defamatory publication being relevant to but not usually determinative of his consent thereto.  The question of whether a plaintiff consents to a publication is not an inquiry into whether the publication would occur if the plaintiff had limitless power to shape the circumstances in which he acts.  Instead, it is a question whether the plaintiff's actions were such that, under the circumstances as they really were, a reasonable person would regard it as only fair to permit the defendant to respond.  As a result, a plaintiff's manifested disagreement with a statement, standing alone, does not preclude his consent to its publication, if he nevertheless deliberately instigates an interaction (with either the defendant or a third party) in the course of which the defendant would reasonably be expected to publish the statement.

Under this rule, implied consent to a defamatory publication will typically arise when a plaintiff requests a conversation or other proceedings for the purpose of discussing a specific topic, and the defamatory comment is then made during those proceedings and on that topic.  Such was the case in *Schechet v. Kesten*, 3 Mich. App. 126 (1966), *Hollowell v. Career Decisions, Inc.*, 100 Mich. App. 561 (1980), and *Medical Planning Consulting, Inc. v. St. Mary's Medical Ctr.*, No. 214018, 2000 WL 33418859  (Mich. App. June 13, 2000), which the Court cited in its grant of summary judgment.  In the Court's view, *Compuware* is not to the contrary.  In that case the Sixth Circuit addressed only the question of whether Compuware's prepublication review of the credit downgrade amounted to consent to its publication.  The district court had not mentioned or considered the overarching contractual relationship between the parties as part of the context in which the existence of consent

should be determined, and the Court of Appeals made no attempt to do so.  When viewed through this frame, the Sixth Circuit's conclusion in *Compuware* was clearly correct: Moody's proposed to publish a report on Compuware's business and sent a copy to Compuware, Compuware objected that the main conclusion of the report was "not warranted," and Moody's proceeded to publish the report anyway.  On that version of the facts, Compuware obviously had done nothing to consent to the report's publication.

By contrast, in this case the evidence does not admit of any question of fact as to whether Romero's actions amounted to an initial consent to Buhimschi's publication of a response to his charges of scientific misconduct, or whether he failed to effectively withdraw that consent once given.  The circumstances unquestionably indicate that Romero consented to some kind of response when he submitted his complaint to Wayne State – because by doing so he was invoking procedures that required notice to Buhimschi and an opportunity for her to respond.  There is no indication that Wayne State's procedures gave Romero any sort of right to review and reject Buhimschi's response before it was passed on to the investigative committee, or that Romero ever asserted any right of this sort. Presumably he could have withdrawn part or all of his complaint entirely, and thus withdrawn his consent to a response as a well.  But of course he did not do so.[6]

Although the question is somewhat closer, the same can be said of the publications to Yale personnel and to the *BJOG* that remain at issue in this case.  As noted in the Court's original Opinion and Order, when Romero agreed to act as complainant in the Wayne State proceedings he certainly would have contemplated that the investigatory

---

[6] The Court will consider below whether the subject matter of Buhimschi's specific communications to Yale personnel and the *BJOG* came within the scope of this consent. For the moment, the relevant question is whether Romero by his actions consented to a response that he regarded as false.

13

committee's conclusions and recommendations would be made known to whatever institution Buhimschi was affiliated with, and would be used to try to prevent what he perceived as future improper attempts by her to publish the research without attributing authorship to him.  But given the serious actions that Yale and the *BJOG* were being asked to take – monitoring Buhimschi for future academic misconduct and issuing a corrected statement of authorship, respectively – Romero could hardly have expected that either institution would act without at least considering whether there was another side to the story.  Therefore, by submitting his complaint at Wayne State Romero also consented to some sort of response by Buhimschi to whatever institutions ultimately were apprised of the Wayne State committee's findings.  Especially given that Buhimschi's actual response consisted of nothing more than a document that was already part of the record of the Wayne State investigation, the fact that Romero may have disagreed with some of its contents does not defeat this consent.

Even if Romero's broader interpretation of *Compuware* is the correct one, that is, even if the rule of *Compuware* is that implied consent to a publication is always defeated by the declarant's knowledge of the plaintiff's disagreement with the publication, the Court concludes that it would not control this case, because it is in intolerable tension with precedents from the Michigan courts.  In concluding that the plaintiffs in *Schechet*, *Hollowell*, and *Medical Planning* had consented to the publications that they respectively complained of, the courts in those cases did not make explicit findings as to whether the defendants had known that the plaintiffs disagreed with the contents of the publications.  Given the nature of those contents, this silence would be almost inconceivable if knowledge of the plaintiff's disagreement really could preclude consent.  As noted, the defendants in *Schechet* stated that plaintiff, a doctor of osteopathy, had among other things engaged in

"[g]ross mis-management of surgical cases," had forged another doctor's name on a patient's discharge documents, and was "obsessed with insecurity, hate, fear, and frustration" that had "warped his judgment" so that he was dangerous to those around him and to his profession. *Schechet*, 3 Mich. App. at 131-32. In *Hollowell* the defendant had stated that plaintiff had "lied about her employment and business background and experiences" and was "incompeten[t] in her profession." *Hollowell*, 100 Mich. App. at 575 n.3. And the plaintiff in *Medical Planning* had been accused of manipulating business records to reap an ill-gotten personal profit. *Medical Planning*, 2000 WL 33418859 at *2. In order to accept Romero's contentions, the Court would first have to conclude that in each of these cases the parties did not raise, and the Michigan courts simply declined to comment on, the potentially dispositive question of the defendants' likely knowledge that the plaintiffs would not agree with these publications. Especially in light of the lack of any other Michigan case in which such a rule is mentioned, this is too much for the Court to swallow.[7]

Moreover, in the Court's view the Michigan rule is sounder than the rule Romero would extract from *Compuware,* and the Michigan courts would be more likely to reaffirm

---

[7] For a similar reason, the Court rejects another argument of Romero's: that implied consent should be held to confer at most a qualified immunity on defamatory publications, thus permitting liability if the defendant makes the publication knowing it is false, or with recklessness as to its truth or falsity. As a matter of policy, the Court is inclined to agree with Romero in this regard. There appears to be no good reason why a plaintiff's issuance of an invitation to a discussion of his disagreements with the defendant should function as an excuse for the defendant to fabricate all manner of falsehoods about the plaintiff. But if the defendant's state of mind might possibly defeat an implied-consent defense in this way, surely the Michigan courts would have discussed the possibility in *Schechet*, *Hollowell*, or *Medical Planning*. Each of those cases involved defamatory publications that, if false, might well have been deliberately so. But the courts in those cases did not mention even in passing any qualification to the implied-consent privilege. The Court regards this as an implicit rejection of the arguments Romero makes here for such a qualification, and will not second-guess the Michigan courts on this matter.

the former than to adopt the latter.  It is highly desirable that people with disagreements be able to invite each other to civilized, orderly discussions of those disagreements, without such discussions doubling as snares for legal liability.  Romero's proposed rule would prevent rather than facilitate such conversations.

In sum, the Court was cognizant when issuing the original Opinion and Order that Romero disputes the accuracy of Buhimschi's alleged defamations, and that Buhimschi had reason to know of this when she published them.  On the facts of this case, however, Romero's instigation of disciplinary proceedings in which Buhimschi had a right to respond constituted implied consent even to a response that he disagreed with.  Therefore, the Court will not disturb its ruling on this basis.

C.  Scope of Consent

1.  In General

Romero's remaining contention is perhaps his strongest: he urges that even if he did consent to some kind of response by Buhimschi, the defamations that she actually responded with were outside the scope of his consent.  As noted above, whether consent has implicitly been given "is to be determined by the reasonable inferences from the conduct in the in the light of the circumstances surrounding it."  Restatement (Second) of Torts, § 583 cmt. (c).  The scope of the consent, and thus of the privilege, is determined similarly,

> by the language or acts by which [consent] is manifested in the light of the surrounding circumstances.  If the person to whom the consent is given reasonably interprets the language used or the acts done as a consent to the publication of the defamatory matter to any person, at any time, in any manner and for any purpose, the publication however made is privileged. On the other hand, a consent may be limited to a publication to a particular person or at a particular time or for a particular purpose.  If so, the publication is privileged only if made within those limitations.

16

*Id.* cmt. (d).

Although the Michigan Court of Appeals has stated in dicta that consent extends only to communications that are "relevant to the purpose for which consent was given," *Ramsey v. Speedway Superamerica, LLC*, No. 279034, at *4 (Mich. App. Aug. 14, 2008), the Michigan courts have not expressly adopted this rule of the Restatement. Nevertheless, the Court is well satisfied that the rule is part of the law of Michigan. It cannot be that consent to a defamatory remark is an all-or-nothing proposition – a plaintiff who invites a conversation at a specific time and about a specific topic does not therefore consent to defamatory remarks about an entirely different topic, or in an entirely different conversation. As Romero correctly notes, the consented-to comments in *Schechet*, *Hollowell*, and *Medical Planning* all took place in specific communications that were explicitly or implicitly requested by the plaintiff. In *Schechet* and *Hollowell* the publications also came in the specific forum in which the plaintiff requested that the conversation take place.

From these cases and from the rule as stated in the *Restatement (Second)*, the Court concludes that there are at least three axes along which a plaintiff may limit the scope of his consent to a defamatory publication: (1) the subject matter that the invited publication may address, (2) the persons to whom it may be made, and (3) the time, place, and other "procedural" circumstances in which the statement may be published to those persons. For instance, if two co-employees are having disagreements about their work, and one of them requests a discussion of these differences in front of their supervisor, the requesting employee does not thereby consent to defamatory publications made to the supervisor behind the requesting employee's back, or made to other co-workers, or on a non-work-related topic.

2.  Persons and Procedures Limitations on Romero's Consent

17

The last two factors in the scope of consent -- the persons to whom, and the circumstances in which, a plaintiff agrees a publication may be made -- can be addressed together in this case.  Indeed, in its previous order denying a portion of the instant motion for reconsideration, the Court has already concluded that in one respect at least, Buhimschi's remarks fit within the scope of Romero's consent in these regards. Opinion and Order of April 2, docket no. 162, pp. 2-3.  As explained above, Romero could hardly have expected that other universities and medical journals would refuse to publish Buhimschi's work on the basis of Wayne State's findings without requesting some kind of response from her.  Since each of Buhimschi's publications was to Yale personnel and the *BJOG* occurred in an attempt to defend herself against the sanctions recommended in the Wayne State report, they are within the procedural scope of Romero's consent.

Romero nevertheless argues to the contrary, making much of the fact that, as a matter of Wayne State's procedural rules, Buhimschi was not permitted to raise new issues for the first time on an appeal from the committee's findings, and was otherwise permitted to appeal only limited issues. Because of Buhimschi's extremely limited participation in the investigation, much if not all of the defamatory matter in Buhimschi's Appeal Document was not brought before the committee as an initial matter, and thus fell afoul of this rule. Furthermore, her appeal document is essentially an attack on every aspect of the investigative committee's findings and recommendations.  Romero therefore argues that he cannot be regarded as having consented to such a procedurally irregular publication.

This argument fails, as an initial matter, because it applies only to Buhimschi's initial submission of the appeal document to Wayne State, and any claim by Romero based on that publication is barred by the statute of limitations.  The publications on which Romero's claims are actually based -- those at Yale and the *BJOG* -- were not within the Wayne State

proceedings, and Wayne State's rules therefore cannot reasonably be interpreted as limiting the scope of Romero's consent to those responses.

Even were the initial submission at issue, however, the Court would be unable to adopt Romero's position. The Court agrees, of course, that by acting as complainant Romero did not consent to a response by Buhimschi outside the course of Wayne State's investigative proceedings and later attempts at enforcement. For instance, by instituting proceedings of which a formal record was kept, Romero might reasonably be said not to have consented to Buhimschi's informally stopping by the homes or offices of the individual committee members to deliver an off-the-record defamatory response. But on the other hand, there is no sound reason to conclude that Romero's consent incorporated every detail of Wayne State's procedural rules for such investigations. Romero apparently does not contest that Buhimschi could in fact have submitted materials in her defense directly to the investigative committee, before it reached any conclusions.[8] There can be no question that such a response would have been within the scope of Romero's consent, in terms of the circumstances in which the response was made. That being the case, the Court discerns no material difference in circumstances between Buhimschi's submission of a response directly to the investigative committee, on the one hand, and her raising issues for the first time on appeal, on the other. In the Court's view, any procedural impropriety in Buhimschi's response was not so severe that a reasonable person would regard it as outside the bounds of what Romero should have expected in response to his complaint.

---

[8] Of course, even then Romero would only have consented to Buhimschi's filing of materials that were responsive to the complaint he was bringing. The Court will consider these subject-matter limitations on Romero's consent below.

In addition, if Buhimschi *had* submitted a response directly to the investigative committee, she would presumably have had the procedural right to re-submit the same materials on appeal.  Thus, it appears that Romero actually consented to the submission of an appeal document.  Again, even if such an appeal would ultimately be ineffective because Buhimschi's claims were procedurally defaulted, the Court sees no material reason why her failure to participate fully in the investigation should somehow defeat Romero's already-given consent to the appeal being filed.

3.  Subject-Matter Limitations on Romero's Consent

It remains to be considered whether the subject matter of Buhimschi's accusations against Romero was within the scope of his consent.   In this regard, Romero notes that many of the defamatory statements in Buhimschi's Appeal Document do not address the question whether Romero was entitled to authorship credit for the proteomics article, but instead allege that he engaged in abusive personal behavior or other scientific misconduct that, even if true, would not have warranted his removal from authorship.

The Court agrees that many of Buhimschi's written accusations do not meaningfully address the question of his entitlement to authorship credit on the proteomics article.  As is explained below, however, the Court is unable to agree that Romero's implied consent was limited to a response on that topic only.   Instead, they also included whether it was improper for Buhimschi *not to notify* Romero when she removed his name from the article. The Court concludes that Buhimschi's allegations, although broad, are nevertheless all responsive to this issue.

It is not clear whether Romero filed a written document to initiate the Wayne State scientific-misconduct inquiry process.  The record does reveal, however, that after the initial

20

"inquiry" phase concluded, the investigative committee set forth three issues that it deemed worthy of further investigation. The first issue, in relevant part, was that

> [i]n the revision to the original [proteomics] manuscript, the names of [several doctors, including] Romero were deleted from the list of authors. None of the authors were informed by Dr. Buhimschi, the corresponding author, that their names were deleted from the list of authors and they were not provided with copies of the comments of the reviewers. Some of the authors that were originally listed did not see the revision to the original manuscript.

Scientific Misconduct Inquiry Report of Aug. 5, 2003, docket no. 126-4, p. 1.

Thus, although the main thrust of Romero's complaint was that Buhimschi had no grounds to remove him as an author, the inquiry report makes clear that her failure to notify him that he had been removed was also a significant topic of discussion. It is also clear from the record that Romero actively presented this to the committee as part of his complaints. When Romero appeared as the first witness before the investigative committee, he made an extensive opening statement which he had prepared in advance. A substantial portion of this opening statement focused on Buhimschi's failure to communicate with Romero in regard to the manuscript. Romero stated to the Wayne State committee that

> During the review of this [proteomics] work, communication among the authors stopped. Dr. Buhimschi was the corresponding author and after informing me that *The Lancet* was interested in the manuscript, would provide no further details about the comments of the reviewers and the status of the revised manuscript. I had to contact the journal to find out that the names of all individuals affiliated with the Perinatology Research Branch (four of seven authors) had been deleted from authorship and that the manuscript was in galley stage and about to be published. This was, of course, a shocking development to me and unlike anything I had experienced. Now having worked for months with Dr. Buhimschi and others on the manuscript, it was difficult to believe what I learned from the staff of *The Lancet*. In one of my telephone conversations with Dr. Charles Young, Senior Editor of *The Lancet*, he expressed surprise that Dr. Buhimschi, as corresponding author, had not communicated with me about the deletion of my name and that of others as were her responsibilities as the corresponding author for the manuscript.

Docket no. 95-5, pp. 8-9. He continued by saying that Buhimschi "became aware of the potential monetary value of this work, and that

> at least in part the genesis of the current difficulty is not the contribution or lack thereof of the individuals affiliated with the PRB to the manuscript submitted to *The Lancet*. If it were, I believe that Dr. Buhimschi would have communicated with us as to who the appropriate list of authors would be.

*Id.* at 9. At various times throughout his opening statement, Romero also highlighted Buhimschi's failure to reply to his continued efforts to assist in revising the manuscript.. *See id.* pp. 11, 21. Romero even went so far as to recount how, after he learned from the *BJOG* that he was not listed as an author on the proteomics article, he had told one of the *BJOG*'s editors "that it was my understanding that the guidelines for authors of *The Lancet* indicated that the corresponding author, in this case Dr. Irina Buhimschi, had an obligation to share the comments of the reviewers with the other coauthors" -- which she had not done. *Id.* at 27. He then told the investigative committee that "*The Lancet* had reaffirmed its policy that the corresponding author, in this case Dr. Irina Buhimschi, should communicate with all parties involved whether or not they are listed in the final version of the manuscript." *Id.* at 29.

In the Court's view, then, no reasonable jury could fail to conclude that Romero's actions as complainant should reasonably have led him to believe that Buhimschi would respond with an explanation of why she had refused or felt unable to communicate with him. The Court further concludes that, to the extent Buhimschi's defamatory statements did not deal directly with Romero's right of authorship, they are nonetheless responsive to this issue of her lack of communication with Romero. In explanation of why she removed Dr. Romero's from authorship of the *Lancet* manuscript, Buhimschi's appeal letter states that after her initial submission of the manuscript, which included Romero as an author, the journal's reviewers requested that it be significantly shortened. Appeal doc., ¶¶ 1.22-23.

22

In shortening the article Buhimschi states that she removed the portions that were attributable to Romero, which necessitated the removal of his name from authorship.  *Id.* Buhimschi states that she did not inform Romero that he had been removed because (1) she felt that he had been rude to her and that she did not owe him this professional courtesy, and (2) given Romero's past actions, she was afraid that if she offended him further he would arrange for Buhimschi's husband to be kicked out of Wayne State altogether.  *Id.*; *see also id.* p. 13 ("Given the improper actions taken by Dr. Romero, and his competitive publication without my knowledge, I did not feel I am [sic] obligated by collegiality to inform Dr. Romero and his employees of my decision not to include them as co-authors on a revised version of the manuscript which will not include their contribution.");

p. 25.  Elsewhere, Buhimschi states that

> [f]ollowing [Romero's] requests the Departmental leadership took actions which placed me and my husband in a vulnerable position.  I was afraid initially to inform Dr. Romero of my decision to restructure the manuscript, to eliminate his instruction and not include him as a co-author on a revised manuscript knowing that he would take the very actions that he took.

*Id.* p. 25.  She also claimed that "[a]s Dr. Romero had an abusive style, I was afraid of the consequences of an open dialogue with him on authorship matters at the time when my husband and I were seeking exit from WS and new employment."  *Id.* ¶ 5.6.4.  The defamatory material in the other two publications is consistent with this explanation as well.

In sum, Buhimschi's narrations of various acts of alleged intimidation and misconduct by Romero are thus directly relevant to her explanation of why she felt unable to notify him that she was removing his name from authorship.  Accordingly, their subject matter falls within the scope of Romero's consent to a response.

## CONCLUSION AND ORDER

Romero has urged that under Michigan law, a plaintiff's consent to a defamatory publication cannot be implied if (i) the defamation had previously been published without consent, (ii) the defendant had reason to know that the plaintiff disagreed with the contents of the publication, or (iii) the publication was outside the scope of the plaintiff's consent. The Court concludes that the first two limitations are not part of Michigan law, and that even if the first one was, there is no fact question as to whether it would preclude a finding of consent in this case. The Court further concludes that, on this record, no reasonable jury could find that the publications Romero complains of in this case were outside the scope of the consent to publication he gave by acting as complainant in the Wayne State scientific-misconduct proceedings.

**WHEREFORE**, it is hereby **ORDERED** that plaintiff's motion for reconsideration of the Court's grant of summary judgment in favor of defendants is **DENIED**.

**SO ORDERED.**

s/Stephen J. Murphy, III
STEPHEN J. MURPHY, III
United States District Judge

Dated: August 10, 2009

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on August 10, 2009, by electronic and/or ordinary mail.

Alissa Greer
Case Manager